(No. 86200.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DARRYL SIMMS, Appellant.

*Opinion filed August 10, 2000.*

HARRISON, C.J., dissenting.

Robert H. Farley, Jr., of Naperville, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Colleen M. Griffin, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

On November 14, 1995, defendant, Darryl Simms, filed a post-conviction petition in the circuit court of Du Page County pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 1994)). With leave of court, on May 21, 1997, defendant filed an amended petition in which he sought relief pursuant to the Post-Conviction Hearing Act and section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West

1994)). On August 12, 1998, the circuit court dismissed the amended petition without an evidentiary hearing. Defendant appeals directly to this court. 134 Ill. 2d R. 651(a). We affirm in part, reverse in part and remand for an evidentiary hearing on certain claims raised by defendant.

## BACKGROUND

Following a bench trial, defendant was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)), criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)), armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)) and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)). At a separate hearing, the trial court sentenced defendant to death. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6). On direct appeal, this court affirmed defendant's convictions, but reversed and remanded for a new death sentencing hearing because of error during the aggravation-mitigation stage of the hearing. *People v. Simms*, 121 Ill. 2d 259 (1988) (*Simms I*).

On remand, a jury determined that defendant was eligible for the death penalty and there were no mitigating factors sufficient to preclude the imposition of a death sentence. Accordingly, the trial court sentenced defendant to death. Again, on appeal, this court reversed and remanded for a new death sentencing hearing because of error during the aggravation-mitigation stage of the hearing. *People v. Simms*, 143 Ill. 2d 154 (1991) (*Simms II*).

At the third death sentencing hearing, a jury once more found defendant eligible for the death penalty and concluded that there were no mitigating factors sufficient to preclude the imposition of a death sentence. Consequently, the trial court sentenced defendant to death. On appeal, this court affirmed defendant's death sentence.

*People v. Simms*, 168 Ill. 2d 176 (1995) (*Simms III*). Subsequently, the United States Supreme Court denied defendant's petition for a writ of *certiorari*. *Simms v. Illinois*, 518 U.S. 1021, 135 L. Ed. 2d 1074, 116 S. Ct. 2556 (1996).

In *Simms I*, *Simms II*, and *Simms III*, we set forth in detail the facts supporting defendant's convictions and death sentence. To the extent that facts contained in these opinions pertain to the issues defendant raises in his amended petition, we will repeat them as we consider each issue.

## DISCUSSION

A proceeding brought under the Post-Conviction Hearing Act is not a direct appeal but a collateral attack on the judgment of conviction. *People v. Hawkins*, 181 Ill. 2d 41, 50 (1998). The purpose of the proceeding is to determine whether in the proceedings which resulted in the judgment of conviction there was a substantial denial of the petitioner's rights under either the state or federal constitution. 725 ILCS 5/122—1 (West 1994). The petitioner in a post-conviction proceeding is not entitled to an evidentiary hearing as a matter of right (*People v. Evans*, 186 Ill. 2d 83, 89 (1999); *People v. Coleman*, 183 Ill. 2d 366, 381 (1998); *People v. Guest*, 166 Ill. 2d 381, 389 (1995)), and the petition cannot consist of nonfactual and nonspecific assertions which merely amount to conclusions that errors occurred at trial (*People v. Kitchen*, 189 Ill. 2d 424, 433 (1999); *Coleman*, 183 Ill. 2d at 381; *Guest*, 166 Ill. 2d at 389). Rather, the allegations in the petition must be supported by the record in the original trial proceedings or by the affidavits filed with the petition, and the petition is subject to dismissal when the allegations are contradicted by the record. *Coleman*, 183 Ill. 2d at 381-82. For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits,

in light of the original trial record, are to be taken as true. *Evans*, 186 Ill. 2d at 89; *Coleman*, 183 Ill. 2d at 380-82.

In a post-conviction proceeding, issues that could have been presented on the direct appeal of the conviction but were not are deemed waived. *People v. Richardson*, 189 Ill. 2d 401, 407-08 (2000); *Evans*, 186 Ill. 2d at 89. Further, determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided. *People v. Williams*, 186 Ill. 2d 55, 62 (1999); *People v. Griffin*, 178 Ill. 2d 65, 73 (1997); *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). The petitioner may not avoid the bar of *res judicata* simply by rephrasing issues previously addressed on direct appeal. *Williams*, 186 Ill. 2d at 62. On the other hand, when a petitioner's claims are based upon matters outside the record, this court has emphasized that it is not the intent of the Act that such claims be adjudicated on the pleadings. *Kitchen*, 189 Ill. 2d at 433; *Coleman*, 183 Ill. 2d at 382. Rather, the function of the pleadings in a proceeding under the Act is to determine whether the petitioner is entitled to a hearing. *Coleman*, 183 Ill. 2d at 382. The circuit court's dismissal of the post-conviction petition without an evidentiary hearing is reviewed *de novo*. *Coleman*, 183 Ill. 2d at 387-89.

As noted above, the circuit court dismissed defendant's amended petition without an evidentiary hearing. The amended petition contains allegations of numerous constitutional violations at defendant's third death sentencing hearing. For the most part, defense counsel did not object to the alleged errors at trial nor include them in a written post-trial motion. Furthermore, on direct appeal, appellate counsel did not include the alleged errors amongst the issues raised. In anticipation of a claim by the State that the alleged errors have been waived, defendant argues that his trial counsel was inef-

fective in failing to preserve the alleged errors for review, and his appellate counsel was ineffective in failing to bring the alleged errors to this court's attention on direct appeal or to argue that trial counsel was ineffective.

A defendant is guaranteed the effective assistance of counsel at trial and at a death sentencing hearing. *Strickland v. Washington*, 466 U.S. 668, 686-87, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2063-64 (1984). A defendant is also guaranteed the effective assistance of counsel on direct appeal as of right (*Evitts v. Lucey*, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985)), and a claim of ineffective assistance of appellate counsel is cognizable under the Post-Conviction Hearing Act (*People v. Mack*, 167 Ill. 2d 525, 531 (1995)). Accordingly, this court has held that the doctrine of waiver should not bar consideration of an issue where the alleged waiver stems from incompetency of appellate counsel in failing to raise the issue on appeal. *Mack*, 167 Ill. 2d at 531-32; *Guest*, 166 Ill. 2d at 390; *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989).

To establish a claim of ineffective assistance of counsel, a defendant must satisfy the familiar *Strickland* test. See *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The test is composed of two prongs: deficiency and prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

First, the defendant must prove that counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. A court measures counsel's performance by an objective standard of competence under prevailing professional norms. To establish deficiency, the defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93; *Griffin*, 178 Ill. 2d at 73-74.

Second, the defendant must establish prejudice. The defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The prejudice prong of *Strickland* entails more than an "outcome-determinative" test. The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Evans*, 186 Ill. 2d at 93; *Griffin*, 178 Ill. 2d at 74.

A defendant must satisfy both prongs of the *Strickland* test. Therefore, "failure to establish either proposition will be fatal to the claim." *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996); accord *Guest*, 166 Ill. 2d at 390.

A court uses the *Strickland* analysis also to test the adequacy of appellate counsel. *Mahaffey*, 165 Ill. 2d at 458; *Caballero*, 126 Ill. 2d at 269-70. A defendant who contends that appellate counsel rendered ineffective assistance, *e.g.*, by failing to argue a particular issue, must show that appellate counsel's failure to raise the issue was objectively unreasonable and prejudiced the defendant. *People v. West*, 187 Ill. 2d 418, 435 (1999) (and cases cited therein). Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Easley*, 192 Ill. 2d 307, 329 (2000); *West*, 187 Ill. 2d at 435. Thus, the inquiry as to prejudice requires that the reviewing court examine the merits of the underlying issue (*Mack*, 167 Ill. 2d at 534), for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal (*Easley*, 192 Ill. 2d at 329; *West*, 187 Ill. 2d at 435; *Guest*, 166 Ill. 2d at 390).

With these principles in mind, we turn to the specific allegations in defendant's amended petition.

## I. Peremptory Challenges

Defendant contends that he was denied a fair sentencing hearing because the State used its peremptory challenges to remove six prospective jurors who expressed reservations about the death penalty, but were not excusable for cause under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and its progeny. Under *Witherspoon*, prospective jurors may not be excused for cause merely because they voice general objections to the death penalty or express conscientious or religious scruples against the imposition of the death penalty. *Witherspoon*, 391 U.S. at 522, 20 L. Ed. 2d at 784-85, 88 S. Ct. at 1776-77. Defendant complains that, through the use of its peremptory challenges, the State was able to do what it could not do under *Witherspoon*: obtain a jury inclined to return a verdict imposing the death sentence. Defendant concludes that the trial court erred in allowing the State to exercise its peremptory challenges to excuse the prospective jurors.

Defendant concedes that trial counsel failed to preserve the issue for review because counsel neither objected to the removal of the prospective jurors during *voir dire* nor raised the issue in a post-trial motion. See *People v. Gilliam*, 172 Ill. 2d 484, 510 (1996); *People v. Pasch*, 152 Ill. 2d 133, 168 (1992). Defendant also concedes that, on direct appeal, appellate counsel did not question the State's use of the peremptory challenges or argue that trial counsel was ineffective in failing to preserve the issue for review. All of the facts needed to raise this issue were present in the record and available on direct appeal. As stated above, any claim that could have been, but was not, presented to the reviewing court on direct appeal is, thereafter, barred under the doctrine of waiver. *Evans*, 186 Ill. 2d at 92.

Defendant contends, however, that trial counsel was ineffective in failing to preserve this issue for review, and appellate counsel was ineffective in failing to argue on

direct appeal that trial counsel was ineffective. We disagree. This court has repeatedly held that *Witherspoon* and its progeny do not limit the State's use of peremptory challenges at *voir dire. People v. Coleman,* 168 Ill. 2d 509, 549 (1995); *People v. Williams,* 161 Ill. 2d 1, 55-56 (1994); *People v. Howard,* 147 Ill. 2d 103, 136-38 (1991); *People v. Lear,* 143 Ill. 2d 138, 150 (1991); *People v. Stewart,* 104 Ill. 2d 463, 481-82 (1984). Thus, contrary to defendant's assertion, trial counsel was not ineffective for failing to object to the use of the peremptory challenges at *voir dire* or to include the issue in a post-trial motion. Moreover, given our repeated rejection of this claim, appellate counsel cannot be deemed ineffective for failing to raise this issue on appeal or argue that trial counsel was ineffective.

## II. *Caldwell* Violations

Citing *Caldwell v. Mississippi,* 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), defendant maintains that the jury was misinformed by the trial court and the State that the jury's role was to "recommend" whether defendant should be sentenced to death. Defendant contends his death sentence must, therefore, be vacated.

At the death sentencing hearing, the trial court conducted individual, sequestered *voir dire.* The trial court used the word "recommend" once in its examination of jurors Peterson, Henning, Brunke, Stephen, and Slager, and twice in its examination of juror Chick. Defendant notes that the trial court also told juror Slager that she had "kind of a limited role." The State used the word "recommend" once in its examination of juror Bozec.

Trial counsel did not object during *voir dire* to the use of the word "recommend." Nor did trial counsel include this issue in a post-trial motion. Appellate counsel neither raised this issue on direct appeal nor argued that trial counsel was ineffective in failing to preserve the is-

sue for review. All of the facts supporting this claim were present in the record and available on direct appeal. The issue is thus waived. *Evans*, 186 Ill. 2d at 92; *People v. Lear*, 175 Ill. 2d 262, 278 (1997). However, as with his challenge to the State's use of the peremptory challenges, defendant argues ineffectiveness of trial counsel in failing to preserve the issue for review and appellate counsel in failing to argue that trial counsel was ineffective. Consequently, we consider the merits of this issue. *Lear*, 175 Ill. 2d at 278.

In *Caldwell*, the Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639. In evaluating an alleged *Caldwell* violation, this court considers the challenged remarks in the context of the entire sentencing proceeding. *People v. Flores*, 153 Ill. 2d 264, 287 (1992); *People v. Fields*, 135 Ill. 2d 18, 57 (1990). This court also considers whether the jury instructions and the verdict forms accurately set forth the law regarding the jury's role in imposing the death penalty (*Flores*, 153 Ill. 2d at 287; *Fields*, 135 Ill. 2d at 57; *People v. Perez*, 108 Ill. 2d 70, 91 (1985)) and the balance between aggravation and mitigation at sentencing (*Flores*, 153 Ill. 2d at 287; *Howard*, 147 Ill. 2d at 164). No single factor is necessarily dispositive. *Flores*, 153 Ill. 2d at 287. The relevant inquiry, considering all the facts and circumstances, is whether the trial court and/or the State misled the jury regarding its sentencing role. *Flores*, 153 Ill. 2d at 287; *Perez*, 108 Ill. 2d at 90-91.

We consider, then, whether the remarks defendant challenges misled the jury. As noted above, use of the word "recommend" at *voir dire* was limited to one comment to each of six jurors, and two comments to the

seventh juror. The trial court conducted individual, sequestered *voir dire*, hence a comment made to one juror would not have been heard by another. Moreover, the jury was repeatedly informed of its responsibility in imposing the death sentence by the trial court, the State, and the defense. In opening remarks at *voir dire*, the trial court informed the prospective jurors that the jury's role was to decide whether defendant was eligible for the death penalty. During questioning of the individual venire members, the trial court repeatedly informed the prospective jurors they would decide whether defendant should be sentenced to death, and the trial court would be bound by that decision. The State and the defense also informed the prospective jurors of the important role they played in the sentencing process. Each of the prospective jurors in question expressed understanding of the jury's role in imposing the death sentence. Lastly, both the jury instructions and the verdict forms accurately set forth the law.

The trial court's remark to juror Slager that she had "kind of a limited role" is taken entirely out of context, as the following questions by the trial court and answers by the juror demonstrate:

"Q. Then if you determine that he is eligible, then we go to the heart of the case, which would be does he receive the death penalty or not?

A. Yes.

Q. Those are two separate hearings, two separate stages. You understand that?

A. Yes.

Q. Even though you may find him eligible, you don't have to impose the death penalty. On the other hand, if you feel that that's called for under the evidence and the law?

A. Yes.

Q. Should your decision be something other than recommending the death sentence, the matter would be turned over back to the Court and the Court would impose a sentence other than death. You understand that?

A. Yes.

Q. Are you comfortable with that aspect?

A. Yes.

Q. It is kind of a limited role. You are not deciding guilt or innocence, you are really deciding the penalty aspect and only as it relates to whether he should receive the death penalty or not.

A. Yes."

Viewed in the context of the entire sentencing proceeding, we conclude that the challenged remarks did not mislead the jury regarding its sentencing role. Accordingly, trial counsel and appellate counsel were not ineffective with respect to this claim.

In a related argument, defendant maintains that three statements the State made to the jury served to diminish the jury's sense of responsibility in imposing the death penalty. During closing argument, the following colloquies took place between prosecutor Telander, defense counsel Brucar, and the trial court:

"MR. TELANDER: The law in this case is what controls your decision and what is going to happen.

Mr. Brucar's argument wants you to feel guilty for following the law. He wants you to think that you are killing Darryl Simms, that you are with premeditation murdering Darryl Simms.

That's just not what is occurring here—

MR. BRUCAR: Objection, I didn't use the term murder.

THE COURT: All right.

MR. TELANDER: *Killing Darryl Simms. That's not what is happening here. That is not the purpose of the hearing.* It is not why every one of us is in this courtroom.

We are in this courtroom for one reason. The law.

\* \* \*

MR. TELANDER: [The judge] is going to tell you if you find that there's not a sufficient mitigating factor, the defendant is to be sentenced to death.

That's your job. *Not to think about is the death penalty right or wrong. Is the death penalty final.* Should we consider mercy to Darryl Simms.

MR. BRUCAR: Objection, they can consider mercy for Darryl Simms.

THE COURT: That's true. But it is argument. I will allow him to argue.

* * *

MR. TELANDER: You have to judge your verdict on the evidence.

And *don't let Mr. Brucar make you feel guilty for fulfilling your oath as jurors. You are not killing anyone.* You are following the law that you swore to do." (Emphasis added.) Defendant complains of the italicized statements.[1]

Once more, we note trial counsel's failure to object to the remarks at the sentencing hearing, and appellate counsel's failure to argue on direct appeal that trial counsel was ineffective. Waiver applies. *Evans*, 186 Ill. 2d at 92. However, we consider the merits of the issue because defendant maintains that trial and appellate counsel were ineffective. *Lear*, 175 Ill. 2d at 278.

Throughout closing argument, the State argued that the jury's role was to determine whether defendant should be sentenced to death. The State informed the jury that its decision to impose the death penalty would be binding on the trial court. The State also argued that it was not the province of the jury to determine the validity of the death penalty. Rather, the jury should impose the death penalty, if appropriate, without feeling guilty for following the law. See *Pasch*, 152 Ill. 2d at 206. The State's argument addressed defense counsel's arguments that the State was asking the jury to kill defendant; that the death penalty is final; and the jury's decision to impose the death penalty would stay with it forever.

Defense counsel made an emotional plea for defen-

---

[1]Throughout this opinion, we consider defendant's challenges to various remarks made by the prosecution or defense counsel. Since we must consider the challenged remarks in context, we have italicized each remark to differentiate the remark from other comments we have provided for context.

dant's life. Repeatedly, counsel told the jury that it would decide whether defendant should live or die, and it had the power to take defendant's life or to spare defendant's life. Thus, counsel nurtured and reinforced the jury's sense of responsibility. We note again that both the jury instructions and the verdict forms accurately set forth the law regarding the jury's role in imposing the death penalty. Having reviewed the challenged remarks in the context of the entire sentencing proceeding, we conclude that the remarks did not lead the jury to feel less responsible for its sentencing decision. See *People v. Burgess*, 176 Ill. 2d 289, 318-19 (1997); *Lear*, 175 Ill. 2d at 279; *People v. Moore*, 171 Ill. 2d 74, 120 (1996). Consequently, trial counsel and appellate counsel were not ineffective with respect to this claim.

In a final *Caldwell* challenge, defendant maintains that juror Jekkals was misled regarding her role in imposing the death penalty. During *voir dire*, the State asked juror Jekkals whether she would "sign a verdict recommending the death sentence" if she felt the sentence was appropriate. In an affidavit attached to defendant's post-conviction petition, a defense investigator states that juror Jekkals told the investigator she believed she was making a recommendation to the trial judge whether or not to impose the death penalty.

We note that defendant's challenge to the State's remark at *voir dire* has been waived. *Evans*, 186 Ill. 2d at 92. However, the affidavit attached to the petition is evidence unavailable to defendant on direct appeal. Further, defendant maintains that he received ineffective assistance of trial and appellate counsel. We therefore address the issue on the merits. See *Evans*, 186 Ill. 2d at 94.

In *People v. Holmes*, 69 Ill. 2d 507 (1978), this court held that testimony or an affidavit of a juror cannot be used to impeach the verdict reached by a jury, where the

testimony or affidavit is offered in an attempt to prove the motive, method or process by which the jury reached its verdict. The court reasoned that " 'being personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore *** such testimony should not be received to overthrow the verdict to which all assented.' " *Holmes*, 69 Ill. 2d at 512-13, quoting *State v. Kociolek*, 20 N.J. 92, 99, 118 A.2d 812, 816 (1955).

In the present case, the jury was polled in open court. Each juror, Jekkals included, affirmed that the verdict read in court was his or her verdict. The statement attributed to juror Jekkals in the affidavit is offered to show that she believed she was making a recommendation to the trial court regarding the death penalty; the judge would actually decide whether to impose the death penalty. Such a statement calls into question the "motive, method or process by which the jury reached its verdict." Consequently, the affidavit may not be used to impeach the verdict reached by the jury. See *People v. Hobley*, 182 Ill. 2d 404, 457 (1998); *People v. McDonald*, 168 Ill. 2d 420, 457 (1995); *People v. Towns*, 157 Ill. 2d 90, 112 (1993).

In reviewing each of the alleged *Caldwell* violations, we conclude that the jury was not misled regarding its role in imposing the death penalty. Thus, trial counsel was not ineffective in failing to preserve the issues for review, and appellate counsel was not ineffective in failing to raise the issues on direct appeal or argue that trial counsel was ineffective. Defendant is not entitled to an evidentiary hearing on these claims.

### III. Jury's Failure to Consider All Elements in Determining Eligibility

Defendant notes that, in order to find him eligible for the death penalty, the jury was first required to find he murdered Lillian LaCrosse in the course of another

felony. Defendant maintains that certain remarks made by prosecutor Telander during closing argument led the jury to believe it did not have to make a separate finding regarding eligibility but could simply rely on the certified copies of convictions:

"[MR. TELANDER]: And the last thing we have to show is that the other felony was either aggravated criminal sexual assault or home invasion or armed robbery. \*\*\* If you find that any one of those three felonies existed, he is eligible. But in this case I believe and assert from the evidence that all three existed. And again, how do you know that? Not because I told you. *Not even really because the evidence has told you, but it has.* But you have certified copies of convictions saying that Mr. Simms was convicted of aggravated criminal sexual assault. Mr. Simms was convicted of home invasion, and he was convicted of armed robbery.

\* \* \*

*I don't mean to make light of your decision, because it is not a light decision. But the decision under the law, you really have no choice to make.* Beyond a reasonable doubt, every single element has been proven, frankly beyond all doubt.

\* \* \*

In addition to the certified copies of convictions, you also have certain facts. A small piece of the trial is brought in to show you what the case was about. To show you how you know he invaded her home, how you know in addition to the convictions that he raped her, how you know he murdered her and how you know he robbed her." (Emphasis added.)

Defense counsel did not object to the italicized remarks at the death sentencing hearing. Further, counsel did not complain of the remarks in a post-trial motion. Appellate counsel did not raise this issue on direct appeal although the facts needed to present the claim were present in the record and available to defendant. Once again, defendant maintains that waiver

should not apply because trial counsel was ineffective in failing to preserve the issue for review, and appellate counsel was ineffective in failing to raise the issue on direct appeal. Thus, we must examine the claim on its merits.

Initially, we observe that the State produced extensive evidence at the death sentencing hearing regarding the commission of the murder, home invasion, aggravated criminal sexual assault and armed robbery. Fourteen witnesses testified at the hearing regarding the circumstances of the crimes. The State also introduced testimony of several witnesses by stipulation. Lastly, the State introduced numerous exhibits relevant to the crimes into evidence.

Next, we note that the trial court instructed the jury it was the jury's duty to determine the facts from the evidence; to apply the law to the facts and in this way decide whether defendant was eligible for a death sentence. The jury was told to presume that defendant was not eligible for the death sentence, a presumption which could not be overcome unless, from all the evidence, the jury was convinced beyond a reasonable doubt that defendant was eligible for a death sentence. The trial court also instructed the jury that the State was required to prove that defendant killed Lillian LaCrosse in the course of an armed robbery, aggravated criminal sexual assault or home invasion. The jury was given two verdict forms: the first declared that the jury could not unanimously find that defendant was eligible for the death sentence because it could not determine that the statutory aggravating factor existed; the second declared that the jury unanimously found that the statutory aggravating factor existed and defendant was eligible for the death penalty. The jurors signed the second verdict form, thereby indicating they had found unanimously that defendant killed Lillian LaCrosse during the course

of another felony. The jury instructions and the verdict forms were proper statements of the law. We must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *Simms II*, 143 Ill. 2d at 174.

Lastly, the remarks assigned as error were juxtaposed to other statements informing the jury that in order to find defendant eligible for the death penalty, it had to determine defendant killed Lillian LaCrosse in the course of an armed robbery, aggravated criminal sexual assault or home invasion. The State also detailed to the jury the evidence supporting a determination that defendant had committed armed robbery, aggravated criminal sexual assault and home invasion, and asked that the jury find the statutory aggravating factors existed.

In turn, defense counsel informed the jury:

"You have got a duty here to scrutinize every scintilla [of] evidence in this case. You have to be satisfied beyond a reasonable doubt that these felonies occurred in the course of a murder. Now, you have to ask yourself another question. The evidence that they put in front of you, is it enough to find that person eligible to be killed?"

Defense counsel reviewed the evidence for the jury, arguing the evidence failed to show a forced entry into Lillian LaCrosse's apartment or the use of a weapon or threats to take her property. Trial counsel also highlighted the evidence supporting defendant's claim of an affair and consensual sex with Lillian LaCrosse. In conclusion, counsel told the jury:

"And you have got a duty to do. You can't put it off on some other Court, saying conviction[s] got to enter, that's it. You can't do that. You are good people, you can't do that. You took an oath, you can't do that. You have to ask yourself, is there enough evidence here for someone to be eligible to be killed?"

In light of the above, we conclude that the jury was not misled regarding the scope of its duties. See *Fields*, 135 Ill. 2d at 57; *Perez*, 108 Ill. 2d at 91. The jury was

well aware that it had to determine the existence of a statutory aggravating factor, and the signed verdict form evinces such a determination. For this reason, we reject defendant's claim that trial counsel was ineffective for failing to preserve the issue for review and that appellate counsel was ineffective for failing to raise the issue on direct appeal.

### IV. Multiple Convictions

Defendant argues that he was improperly prejudiced by the admission, during the aggravation-mitigation phase of the death sentencing hearing, of four certificates of conviction for residential burglary, all related to defendant's entry into Lillian LaCrosse's apartment on the date of the murder. Defendant notes he could only be guilty of one count of residential burglary. He contends the jury may have believed the three additional convictions for residential burglary were relevant to a determination of his sentence.

Defendant raised this issue on direct appeal. See *Simms III*, 168 Ill. 2d at 198. The court's determination in *Simms III* is *res judicata. Griffin*, 178 Ill. 2d at 73.

Defendant maintains, however, that he challenged his convictions in *Simms I*, but the court failed to address the issue. Hence, defendant argues that the court should not have held in *Simms III* that defendant could not challenge his convictions. We decline defendant's invitation to revisit this issue.

### V. Jury Instruction—Underlying Felonies

Defendant maintains that the trial court erred in failing to instruct the jury regarding the mental state necessary to sustain a conviction for aggravated criminal sexual assault or armed robbery. Although the jury was instructed regarding the mental state necessary to sustain a conviction for home invasion, the jury returned a general verdict, finding that the aggravating factor

existed, without specifying that its verdict was based on the underlying offense of home invasion. Defendant argues his death sentence must be vacated because the jury may have determined that he was eligible for the death sentence based on the underlying offense of aggravated criminal sexual assault or the underlying offense of armed robbery.

Defendant acknowledges that trial counsel failed to object to the instructions the trial court gave the jury and failed to offer alternate instructions. Also, appellate counsel failed to raise this issue on direct appeal. Defendant maintains, however, that trial counsel was ineffective because trial counsel failed to object to the instructions or offer alternate instructions, and appellate counsel was ineffective because appellate counsel failed to argue that trial counsel was ineffective. We disagree.

In *People v. Terrell*, 132 Ill. 2d 178, 209 (1989), this court held that the legislature did not intend the aggravated criminal sexual assault statute (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) to define a strict liability or public welfare offense. Since the aggravated criminal sexual assault statute does not prescribe a mental state applicable to the offense, a mental state of intent, knowledge or recklessness must be implied. *Terrell*, 132 Ill. 2d at 209, citing Ill. Rev. Stat. 1985, ch. 38, pars. 4—3 through 4—6, 4—9. This court, however, did not consider the additional issue presented here, namely, what, if any, jury instructions are required for the offense of aggravated criminal sexual assault.

In *People v. Burton*, 201 Ill. App. 3d 116 (1990), our appellate court considered this issue and rejected the defendant's contention that he was entitled to instructions setting forth the required mental states the State had to prove to convict him of aggravated criminal sexual assault. The *Burton* court explained that the mental states implied by section 4—3 of the Criminal Code are

in the nature of general criminal mental states, distinguished from specific mental states about which the jury must be advised in instructions defining an offense or describing the elements the State must prove. Further, the *Burton* court noted that the mental states implied by section 4—3 of the Criminal Code are mental states which almost always accompany the acts alleged. The *Burton* court concluded:

"[S]ome mental states involved in offenses, although not specifically mentioned in the statute defining the offense, may be implied in the offense and be specific enough to require instruction to the jury. Under some circumstances, the mental state implied by section 4—3 of the Code may possibly be so specific as to require instruction. [Citation.]

Here, the implied mental states were not specific, and the circuit court did not err in giving the pattern instructions, which did not set forth those mental states." *Burton*, 201 Ill. App. 3d at 122.

Accord *People v. Giles*, 261 Ill. App. 3d 833, 845 (1994); *People v. Franzen*, 251 Ill. App. 3d 813, 830 (1993); *People v. Fryer*, 247 Ill. App. 3d 1051, 1060 (1993); *People v. Bock*, 242 Ill. App. 3d 1056, 1075-76 (1993). See also *People v. Bofman*, 283 Ill. App. 3d 546, 550-51 (1996); *People v. Robinson*, 265 Ill. App. 3d 882, 888-89 (1994); *People v. Adams*, 265 Ill. App. 3d 181, 187 (1994); *People v. Calva*, 256 Ill. App. 3d 865, 870 (1993).

We agree with the *Burton* court that jury instructions on a specific mental state are not required for the offense of aggravated criminal sexual assault. Consequently, we reject defendant's argument that trial counsel was ineffective for failing to object to the instructions or to offer alternate instructions. We also reject defendant's argument that appellate counsel was ineffective for failing to argue that trial counsel was ineffective.

Next, we consider whether the trial court should have instructed the jury on a specific mental state for the offense of armed robbery. Initially, we note that the statutory provision for the offense of armed robbery, like the

statutory provision for the offense of aggravated criminal sexual assault, does not prescribe a particular mental state applicable to the elements of the offense. However, in *People v. Jones*, 149 Ill. 2d 288, 297 (1992), this court held that, pursuant to section 4—3 of the Criminal Code, "either intent, knowledge or recklessness is an element of robbery."

In *People v. Lewis*, 165 Ill. 2d 305 (1995), this court stated that robbery is a general intent crime, and, unlike specific intent crimes, proof that the prohibited harm was intended is not necessary to proof of a general intent crime. *Lewis*, 165 Ill. 2d at 337. The court concluded that "proof that robbery was intended is not required to sustain a conviction for armed robbery. The gist of armed robbery is simply the taking of another's property by force or threat of force." *Lewis*, 165 Ill. 2d at 338.

In the present case, evidence was presented that defendant stabbed Lillian LaCrosse and took her purse, her jeans, and a movie camera her parents owned. This evidence supported defendant's conviction for armed robbery. In a statement he gave to the police, defendant admitted killing Lillian LaCrosse but claimed that he took her purse and the movie camera because he feared he had left fingerprints on them the previous afternoon. However, defendant's subjective intent in taking the property, *i.e.*, to dispose of items containing incriminating evidence, was of no import. The jury was instructed that a person commits the offense of armed robbery when he, while carrying on or about his person or while otherwise armed with a dangerous weapon, takes property from the person or presence of another by the use of force or by threatening the imminent use of force. This instruction was appropriate since the mental state of intent, knowledge or recklessness could be inferred from the circumstances of the crime. Pursuant to this court's holding in *Lewis*, the State was not required to prove

that defendant acted with the subjective intent to rob Lillian LaCrosse, nor was the trial court required to instruct that the jury must find defendant acted with the subjective intent to rob. See also *People v. Garland*, 254 Ill. App. 3d 827 (1993); *People v. Childrous*, 196 Ill. App. 3d 38, 54 (1990) (listing cases holding mental state is not an essential element for jury instructions on armed robbery). Thus, trial counsel was not ineffective in failing to object to the jury instructions on armed robbery or offer alternate instructions, and appellate counsel was not ineffective in failing to raise the issue on direct appeal or argue that trial counsel was ineffective.

## VI. Disclosure of Aggravating Evidence

Defendant filed a bill of particulars as well as a motion to compel the prosecution to disclose nonstatutory aggravating factors. The trial court denied the motion. Defendant maintains that the death sentencing hearing is a critical stage of trial, and he needed notice and time to prepare a response to the nonstatutory aggravating factors the State intended to introduce. He assigns error to the trial court's denial of his motion to compel.

Trial counsel did not raise this issue in a post-trial motion. Appellate counsel did not raise this issue on direct appeal or argue that trial counsel was ineffective. In his amended petition, defendant has not alleged that appellate counsel was ineffective in this respect. As noted above, issues that could have been presented on direct appeal but were not are waived in subsequent proceedings. *Evans*, 186 Ill. 2d at 89. Thus, we conclude that this issue is procedurally barred.

## VII. Testimony of Attorney

In his amended petition, defendant argues that the State should not have had attorney Katherine Zellner testify at the second stage of the death sentencing hearing regarding an incident she observed in 1991. Defen-

dant contends that the information Zellner possessed regarding the incident was subject to the attorney-client privilege and should not have been disclosed absent a waiver of the attorney-client privilege. In a related argument, defendant maintains that Zellner should not have agreed to represent him in 1992 because she knew she might be a witness against him regarding the 1991 incident, and because prosecutor Telander was her partner. The basis for Zellner and Telander's partnership was their joint representation, pursuant to court appointment, of a criminal defendant in Du Page County over a six-month period in 1992. Defendant asserts he was denied the effective assistance of counsel because Zellner's representation of defendant was subject to a *per se* conflict of interest.

At the death sentencing hearing, Zellner testified that in the fall of 1991, while interviewing a client in the visiting room at Pontiac Correctional Center, she observed defendant strike his wife, Christine Simms, in the face. Defendant then unzipped his pants, and his wife performed oral sex on him. Although there are television cameras in the visiting room, they do not record activities at some of the tables in the visiting room. Zellner did not report the incident to the guard seated at a desk by the door. She had reported a sex act she observed on another visit to this very guard, and he failed to take action. Zellner also testified that when she learned that Birkett was prosecuting defendant's case, she told Birkett about the oral sex incident.

At the conclusion of the death sentencing hearing, defendant motioned that the trial court appoint new counsel to review specific allegations of ineffectiveness of trial counsel. Defendant alleged, *inter alia*, that trial counsel was ineffective because he did not have defendant testify to rebut Zellner's testimony. At a post-trial hearing on defendant's motion, Zellner testified as fol-

lows. In the spring of 1992, while she and her associate, Daniel DeLay, were interviewing Larry Eiler, a prisoner at Pontiac she had been appointed to represent, defendant asked Eiler if defendant could talk to Zellner for a moment. Defendant and his wife, Christine Simms, then spoke with Zellner and DeLay. Defendant asked Zellner what she thought of Telander; whether it was ethically appropriate for Telander to become close to the LaCrosse family. She answered that she and Telander were both representing a criminal defendant in Du Page County and, in her opinion, Telander is an ethical attorney. Defendant then asked her if she would see Telander sometime soon. She replied she would see him within the next two weeks. Defendant requested that she ask Telander whether some kind of a deal could be worked out if defendant pled guilty. She said, "I don't know anything about your case, but I will convey the message." Subsequently, she spoke with Telander, with Birkett present. When she told Telander that defendant wanted to plead guilty, Telander and Birkett laughed, explaining that guilt was not at issue; defendant's case had been remanded for a new sentencing hearing.

Zellner also testified that she told Telander and Birkett about the 1991 oral sex incident. She could not recall whether she told them about the incident at the time she relayed defendant's plea-bargaining request or during another conversation. However, she believes they only had one conversation about defendant. Zellner stated that she did not tell defendant and his wife that Telander was a close friend. The first time she met Telander was when they were appointed to jointly represent a criminal defendant in Du Page County. Telander withdrew from the case after six months. Zellner also stated that she has never accepted a defendant facing the death penalty as a private client. She has only represented such defendants when she has been appointed by the court.

We consider first whether Zellner should have been allowed to testify at the death sentencing hearing regarding the 1991 incident. We note that trial counsel did not object to Zellner's testimony at the death sentencing hearing. Furthermore, appellate counsel did not argue on direct appeal that trial counsel was ineffective for failing to object to Zellner's testimony. Defendant maintains, however, that trial counsel was ineffective for failing to object to Zellner's testimony and appellate counsel was ineffective for failing to raise this issue on appeal.

The purpose of the attorney-client privilege is to secure for the client the ability to confide freely and fully in his or her attorney, without fear that confidential information will be disseminated to others. *People v. Knuckles*, 165 Ill. 2d 125, 130 (1995). In *People v. Adam*, 51 Ill. 2d 46 (1972), this court restated the essential elements for the creation and application of the attorney-client privilege:

" '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.' " *Adam*, 51 Ill. 2d at 48, quoting 8 J. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961).

The privilege is based upon the confidential nature of such communications. *People v. Williams*, 97 Ill. 2d 252, 294 (1983).

In the present case, defendant cannot argue that he made a privileged communication to Zellner while seeking her legal advice. See *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 408 (1998). Additionally, the 1991 incident occurred in the presence of others, *i.e.*, Zellner's client and the desk guard, in a room under camera surveillance. At the very least, defendant's behavior was subject to observation by anyone present in

the room. A defendant's voluntary disclosure of information, or other matters subject to being testified to, in the presence of opposing counsel or any other third person who is not the agent of the defendant or his attorney is not privileged. *Williams*, 97 Ill. 2d at 295.

We conclude that Zellner did not disclose any communication subject to the attorney-client privilege. Trial counsel was not ineffective in failing to object to Zellner's testimony and appellate counsel was not ineffective in failing to raise this issue on direct appeal or argue trial counsel's ineffectiveness.

Next, we consider whether an attorney-client relationship existed between defendant and Zellner in 1992. The attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and client. *In re Chicago Flood Litigation*, 289 Ill. App. 3d 937, 941 (1997). As explained in *Corti v. Fleisher*, 93 Ill. App. 3d 517, 521 (1981), the relationship "is only created by a retainer or an offer to retain or a fee paid. (*De Wolf v. Strader* (1861), 26 Ill. 225.) It cannot be created by the attorney alone or by an attorney and a third party who has no authority to act." See also *In re Chicago Flood Litigation*, 289 Ill. App. 3d at 941; *Holstein v. Grossman*, 246 Ill. App. 3d 719, 743 (1993). Being a consensual relationship, "[t]he client must manifest [his] authorization that the attorney act on [his] behalf, and the attorney must indicate [her] acceptance of the power to act on the client's behalf." *Simon v. Wilson*, 291 Ill. App. 3d 495, 509 (1997).

The record from defendant's death sentencing hearing reveals that throughout the proceedings defendant was represented by three court-appointed attorneys, Baker, Brucar and Ost. Defendant did not seek to have the trial court appoint Zellner as new counsel or as additional counsel. Zellner testified that she did not discuss possible representation with defendant or defendant's

wife. Defendant wanted a moment of her time; posed some questions regarding Telander; and asked that she inquire of Telander whether a deal could be worked out. These facts do not show a consultation by a layperson with an attorney for the purpose of securing that attorney's legal advice on a particular matter. These facts also do not show that Zellner ever agreed to represent defendant. Although defendant's wife stated in an affidavit that she spoke with Zellner three times about representing defendant, she did not state that either she or defendant paid Zellner a retainer, or attempted to have the trial court appoint Zellner as counsel. To the contrary, in her affidavit defendant's wife indicates that Zellner wanted $15,000 for the sentencing hearing, with a 30% retainer. Further, she states that when she told Zellner she could not raise the money for the fee, Zellner replied that she did not give free advice and there was nothing more to talk about. Thus, the affidavit does not contradict the record, but rather supports our conclusion that an attorney-client relationship did not exist between defendant and Zellner. Consequently, defendant did not have a right to conflict-free representation from Zellner. It follows that the circuit court properly dismissed this claim.

## VIII. Perjury

In the amended petition, defendant alleges that three of the State's witnesses, Mary Matas, Detective Mueller of the Hillside police department, and Joseph Mogavero, committed perjury at the death sentencing hearing with full knowledge of the State. Defendant also alleges that the State failed to disclose certain information to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and *Kyles v. Whitley*, 514 U.S. 419, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995).

Matas' testimony and Detective Mueller's testimony are fundamentally related. First, we will summarize the testimony of these witnesses, and the allegations in defendant's amended petition pertaining to them. We will then summarize Mogavero's testimony and the allegations pertaining to him.

### Mary Matas and Detective Mueller

At the death sentencing hearing, Matas testified that, on the evening of March 17, 1985, defendant entered her car without her knowledge. When she got into the car to drive home from work, defendant grabbed her from behind, cut her with a knife, hit her on the face and in the ribs, forced her to cut herself with a razor blade, and raped her. Defendant left her tied to the car's steering wheel. Three weeks later, on the evening of April 9, 1985, defendant attacked her as she exited her car in her garage. Defendant said he did not get enough the first time. He hit her in the face with a wrench, threw her to the ground and kicked her. Defendant was scared away when a family member turned the lights on in the back yard. Matas testified that she identified defendant, without hesitation, in a photo lineup on July 18, 1985.

Mueller investigated the Matas incidents. He testified that, in July of 1985, he became aware of the circumstances of the LaCrosse murder and sexual assault. He obtained a photograph of defendant from the Addison police department. He included the photograph, along with photographs of defendant's brothers, Sherrod and Troy Simms, in a photo lineup he showed Matas. When Matas viewed the photographs, she became emotionally upset. She told Mueller she recognized her assailant, and positively identified defendant.

In 1997, defendant's post-conviction counsel subpoenaed the records of the Hillside police department and the Bellwood police department regarding the Matas incidents. He received a 39-page report from the Hillside

police department (the 1997 report), and a two-page report from the Bellwood police department. In 1985, at the guilt phase of defendant's trial, defense counsel, now Associate Judge Eugene Wojcik, had also requested the Hillside police department reports regarding the Matas incidents. In an affidavit attached to the amended petition, Judge Wojcik states that he received a 13-page report from the Hillside police department (the 1985 report). Judge Wojcik also states his belief that "*all* the documents set forth in Exhibit 'S,' [the 1997 report] and *all* the information contained therein were not disclosed to [him] by either the Hillside Police Department or the State." (Emphasis in original.) Of the two sets of reports from the Hillside police department, only two pages are identical.

A comparison of the 1985 and 1997 reports reveals certain inconsistencies. The 1985 report shows that Mueller had Matas view a photo lineup on July 18, 1985. The photo lineup contained pictures of defendant's brothers, Troy and Sherrod. Matas readily identified defendant as her assailant. The 1997 report seems to indicate that Mueller conducted two photo lineups in connection with the Matas incident prior to July 1985. At the first lineup on May 17, 1985, Matas indicated that defendant's picture "looked close," but she needed a better photograph. At the second lineup on June 1, 1985, Matas stated that defendant looked like her assailant, but she would have to hear him speak to be sure. The two lineups did not include photographs of defendant's brothers.

In the 1997 report, Mueller states that Matas felt she knew her assailant from a prior contact and might recognize his voice. The offender had called Matas by her middle name, Sue, when he raped her. Notes from another police officer indicate that Matas believed she had heard her assailant's voice before but was not sure she would be able to recognize his face if she saw him again.

The 1997 report also contains extensive notes on the course of the investigation. In particular, Mueller interviewed various members of Matas' family and her former spouse because Matas believed the rape was a setup.

The 1985 report supports Matas' testimony at the death sentencing hearing. The 1997 report bespeaks the hesitancy in her identification of defendant as her assailant. Defendant maintains that the State's failure to disclose the 1997 report earlier was in violation of *Brady*, *Giglio* and *Kyles*. He argues that, had the State disclosed the 1997 report, he would have been able to attack Matas' tentative identification and the course of the investigation. He would also have been able to circumvent the alleged perjury at the death sentencing hearing. Lastly, defendant maintains the State should have disclosed the Bellwood police department report because it indicates that Matas could not positively identify her assailant in the garage attack, although she believed her assailant was the person who had previously raped her.

### Joseph Mogavero

Prior to the commencement of the death sentencing hearing, defendant filed a motion *in limine* to bar the introduction of gang-related evidence. The trial court granted the motion as to any evidence that defendant possessed gang paraphernalia or signs. The trial court also forbade mention of gangs in front of the jury, unless the State obtained a ruling that testimony from a specified witness showed a connection between defendant's gang affiliation and an aggravating factor.

In compliance with this ruling, the State made an offer of proof prior to Mogavero's testimony. Outside the presence of the jury, Mogavero testified regarding defendant's gang affiliation, defendant's attempts to intimidate other inmates, and defendant's attempts to solicit sexual acts from Mogavero. Mogavero also testified

that the State had not offered to reduce his forgery sentence; he had finished his jail sentence; he did not have any pending cases; and he was not currently on bond. The trial court allowed Mogavero to testify at the sentencing hearing.

At the sentencing hearing, Mogavero testified that he served time in the Du Page County jail in 1993 for forgery. Although he had been released from jail, he was still on probation for the forgery. In March 1993, he was housed in the same cell pod as defendant. Defendant told him defendant was a high-ranking member of a gang, and defendant used his affiliation with the gang and other tactics to intimidate the inmates in the cell pod. Defendant also "bragged about how he can get any kind of dope he wanted and free coke." Mogavero testified further that defendant made a pass at him, which he refused. Defendant also solicited sex from another inmate. Mogavero did not know whether defendant had sex with the other inmate.

On cross-examination, Mogavero stated that he was a recovering cocaine addict. Defense counsel then quizzed him on his motives for testifying:

"Q. With regard to your testimony today, have you been assured any consideration from the State?

A. No, I haven't, and I didn't ask for any.

Q. You are testifying today out of your interest in justice?

A. Yes, I am."

In his amended petition, defendant states that, in 1993, Mogavero was in jail for burglary in addition to forgery. Defendant also states that Mogavero was promised a favor in return for his testimony. Defendant attached to his amended petition an affidavit in which Lee Smith, a defense investigator, avers that, on January 22, 1997, he asked Mogavero whether the prosecutors offered any type of deal if Mogavero testified against defendant. Mogavero replied: "Joseph Birkett told him that by looking at his record he would be getting in trouble again

and if he testified against Darryl Simms [Birkett] would owe him a favor if he got in any more trouble with the law."

Defendant also claims the State withheld evidence that Mogavero pled guilty to burglary on May 10, 1993, and was sentenced to six months' imprisonment, to be served concurrently with his forgery sentence, followed by 30 months of probation; that Mogavero was required to participate in a drug and substance abuse program as a condition of probation for the forgery and burglary offenses; that Mogavero pled guilty to domestic battery on June 1, 1993, and was placed on one year of probation; and that Mogavero violated the terms of his probation by failing to report to probation on three occasions and refusing to submit to a drug test. Defendant attached affidavits from defense counsel Baker and Ost, in which each states the first time he recalls receiving any information concerning the Mogavero matters was in October 1996. Defendant maintains that the State had an obligation under *Brady*, *Giglio* and *Kyles* to disclose the information regarding Mogavero.

Having reviewed the witnesses' testimony and the post-conviction claims[2] in defendant's amended petition, we turn to a consideration of the applicable law. We find our opinion in *Coleman*, 183 Ill. 2d 366, to be instructive.

In *Coleman*, this court summarized federal and Illinois jurisprudence regarding the use of perjured testimony and the disclosure of favorable evidence to the defense, and, in particular, detailed the evolution of the United States Supreme Court's *Brady* decision. See *Coleman*, 183 Ill. 2d at 391-92. The court noted that, in *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d

---

[2]Defendant also sought relief for these claims under section 2—1401 of the Code of Civil Procedure. Because of our resolution of defendant's post-conviction claims, we will not consider this alternate ground for relief.

342, 349, 96 S. Ct. 2392, 2397 (1976), the Supreme Court identified "three quite different situations" to which *Brady* applies. In the first situation, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. The second situation is characterized by a pretrial request for specific evidence followed by the prosecution's noncompliance with the request. In the third situation, the defense makes either no discovery request or only a general request for "*Brady*" material and exculpatory matter is withheld by the prosecution. This court pointed out, however, that in *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), the Supreme Court abandoned the distinction between the second and third situations, *i.e.*, the "specific request" and the "general or no request" situations.

The court then outlined the corresponding tests the Supreme Court requires that we use in determining whether a defendant's conviction must be reversed. In the first situation, the defendant's conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In the second and third situations, favorable evidence is material and constitutional error results from its suppression by the government, if the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Finally, the cumulative effect of the suppressed evidence also informs the materiality determination. See *Coleman*, 183 Ill. 2d at 392-93.

Lastly, recognizing that a particular case may involve both the use of perjured testimony and the failure to disclose *Brady* material, the court then held:

"[W]here undisclosed *Brady* material undermines the credibility of specific testimony that the State otherwise knew to have been false, the standard of materiality applicable to

the first [*Brady* situation] applies. In such circumstances, the failure to disclose is 'part and parcel of the presentation of false evidence to the jury and therefore "corrupt[s] *** the truth-seeking function of the trial process," [citation] and is a far more serious act than a failure to disclose generally exculpatory material.' [Citation.] Therefore, the standard of materiality in this case is whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Coleman*, 183 Ill. 2d at 394.

With *Coleman* firmly in mind, we turn to defendant's post-conviction claims of perjury and *Brady* violations. At the outset, we note that *Coleman* is applicable even though the alleged perjury in the present case took place at a death sentencing hearing and not at trial. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment ***." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. We also note that the State's alleged conduct with respect to Matas and Detective Mueller falls within both the first and the second/third *Brady* situations. It is within the first situation because Detective Mueller's testimony regarding the course of his investigation and Mary Matas' testimony that she did not have any hesitation when she identified defendant in the lineup were known by the State to be false. It is within the second/third situation because the 1997 report and the Bellwood police department report revealed inconsistencies in Mary Matas' description of her assailant; hesitancy in her identification of defendant; and the existence of other suspects, with varying motives, in the Matas incidents. Likewise, the State's alleged conduct with respect to Mogavero falls within both the first and the second/third *Brady* situations. It is within the first situation because Mogavero's testimony that the State had not made any promises to him and that he did not have any pending cases was known by the State to be false. It is within the

second/third situation because the State failed to disclose that Mogavero had pled guilty to burglary and domestic battery, and Mogavero was in violation of the terms of probation, information that could have been used for impeachment. Thus, the standard of materiality to be used is whether there is any reasonable likelihood that the allegedly false testimony could have affected the outcome of the death sentencing hearing. Accordingly, we can affirm the circuit court's decision to dismiss these claims without an evidentiary hearing only if we can conclude, as a matter of law, that the allegedly false testimony (which we must assume is true for purposes of the motion to dismiss) does not fall within this strict standard of materiality. See *Coleman*, 183 Ill. 2d at 394.

Matas was a prominent witness at the death sentencing hearing. As set forth above, she testified that defendant raped her and battered her a few weeks before he sexually assaulted and murdered Lillian LaCrosse. Matas testified that she identified defendant in a photo lineup on July 18, 1985, and she had no doubt in her mind back in 1985 that defendant was her assailant. We recognize that two other women, Sandra Sender and Sharon Williams, testified that defendant had sexually assaulted them. Their testimony, however, was not as effective because defendant was charged with a misdemeanor in connection with the assault on Sharon Williams, and pled guilty to aggravated battery in connection with the assault on Sandra Sender.

Detective Mueller's testimony supported Matas' testimony. Detective Mueller testified that Matas positively identified defendant in a photo lineup which allegedly contained photographs of defendant's brothers. Her ability to discern differences between the photographs of defendant and his brothers would surely have weighed in the jury's mind.

Mogavero was also a prominent witness at the death

sentencing hearing. His testimony contained the first mention of defendant's involvement in a gang. Mogavero's testimony reflected defendant's attempts to intimidate, and to obtain sexual favors from, other prisoners, and defendant's disregard for prison regulations. Had the defense known that Mogavero had pled guilty to two other offenses and that the State had, as alleged, made a promise to Mogavero in return for his testimony, the defense might have effectively impeached him.

Having reviewed the entire transcript, we are unable to conclude there exists no reasonable likelihood that the allegedly false testimony would not have affected the jury's determination to impose the death penalty. Accordingly, we hold that the allegations in defendant's amended petition were sufficient to make a substantial showing of a constitutional violation and to require an evidentiary hearing to determine if the violation did in fact occur. The circuit court's dismissal of these claims without an evidentiary hearing was improper. We, of course, express no opinion on the actual merits of defendant's claims. Rather, we reverse and remand with instructions for the circuit court to proceed to the evidentiary stage on these claims.

### IX. Testimony Regarding Prior Death Sentence

In proceedings leading to the death penalty hearing, the trial court granted a motion *in limine* barring the State from eliciting testimony regarding defendant's prior death sentences for the murder of Lillian LaCrosse or the fact that defendant was on death row. At the death penalty hearing, the State solicited testimony from Dr. Wahlstrom, a psychiatrist and medical doctor who testified on defendant's behalf, that defendant had told other people he had a loving, caring family. The State then asked Dr. Wahlstrom the following questions:

"Q. And at the time that he made those statements to other people, he was not facing the death penalty. Is that right?

A. (No response).
Q. Correct?
A. I am not sure of the dates."

The trial court sustained trial counsel's objection and instructed the jury to disregard the answer.

In the amended petition, defendant contends that the State violated the motion *in limine* by questioning Dr. Wahlstrom as noted above. Trial counsel did not include this issue in a post-trial motion. Further, appellate counsel did not raise this issue on direct appeal although the facts needed to raise the issue were present in the record and available to counsel. Waiver applies. *Guest*, 166 Ill. 2d at 390. Defendant maintains, however, that appellate counsel was ineffective in failing to raise the issue on appeal. Defendant also maintains that, in light of numerous instances of prosecutorial misconduct in this case, this court need not assess the prejudicial effect of the alleged violation of the motion, but should find that defendant is entitled to a new death sentencing hearing. Given that we find error only with respect to the perjury allegations, we reject defendant's contention that we need not determine whether he was prejudiced by appellate counsel's inaction. Instead, we find that defendant has failed to show prejudice under the *Strickland* test.

As noted above, trial counsel objected to the testimony elicited from Dr. Wahlstrom, and the trial court instructed the jury to disregard the testimony. We must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *Simms II*, 143 Ill. 2d at 174. Moreover, we do not believe the jury would have viewed the testimony as a reference to defendant's prior death sentences or to defendant's presence on death row. Thus, we conclude that appellate counsel was not ineffective for failing to raise the matter on direct appeal.

X. Admission of Defendant's Statements

Defendant contends that he suffered prejudice from

the admission, at the death sentencing hearing, of a statement he made to Detective Mueller regarding the aggravated criminal sexual assault of Mary Matas. Although the statement is a denial of any involvement with the aggravated criminal sexual assault, the State used other remarks defendant made to Detective Mueller as evidence of defendant's untruthfulness.

This issue was considered by this court on direct appeal. There, defendant argued that the admission of the statement at the death sentencing hearing violated his sixth amendment right to counsel. The State argued that defendant had waived this claim since trial counsel made only a general objection to the statement. This court agreed, finding that "[a] general objection results in a waiver of the claim of error unless (1) the grounds for the objection were clear from the record, (2) trial counsel's assistance was ineffective [citation], or (3) there was plain error." *Simms III*, 168 Ill. 2d at 193. The court determined that "[a]n objection based on the sixth amendment right to counsel was not clear from the record since, at the time of the general objection, the testimony did not reflect that the defendant was unrepresented by counsel during the statement." *Simms III*, 168 Ill. 2d at 193. Next, the court rejected defendant's claim of ineffective assistance, observing that "[i]n light of the minor role played by the challenged statement, there was no reasonable probability that admission of defendant's statement changed the outcome of defendant's sentencing hearing." *Simms III*, 168 Ill. 2d at 194. Lastly, the court declined to review the issue as plain error because the evidence was not closely balanced, and admission of the challenged statement did not deny defendant a fair sentencing hearing. *Simms III*, 168 Ill. 2d at 194-95.

In these proceedings, defendant maintains that the court in *Simms III* should not have held the issue waived. Further, defendant maintains that trial counsel was inef-

fective to the extent that he failed to make the record clear regarding the basis for the objection, and appellate counsel was ineffective in failing to argue that trial counsel was ineffective. Defendant's arguments on waiver and ineffective assistance of trial counsel were fully addressed in *Simms III*. The court's resolution of these contentions is *res judicata*. *Williams*, 186 Ill. 2d at 62.

Since the challenged statements did not prejudice defendant (*Simms III*, 168 Ill. 2d at 194), it follows that appellate counsel was not ineffective for failing to argue ineffective assistance of trial counsel (*Griffin*, 178 Ill. 2d at 82).

## XI. State's Closing Argument

Defendant next argues he was denied a fair hearing because of certain inflammatory and improper remarks made by the prosecution during closing arguments at the second stage of the death sentencing hearing. Defendant cites 22 separate remarks that he believes are, either individually or cumulatively, sufficiently prejudicial to require a new death sentencing hearing. One remark is said to be misstatement of the law on the issue of mitigation. We reviewed this remark on direct appeal, and our determination that the remark was proper is *res judicata* to defendant's renewed challenge. *Simms III*, 168 Ill. 2d at 196-97. The remaining remarks are to the effect: that there was insufficient mitigation to preclude the imposition of the death penalty; that the only punishment supported by the law and the evidence was the imposition of the death penalty; that defendant lacked remorse; that defendant could have had witnesses testify that he was sorry for the crimes; that defendant would be a "gang banger" until executed; that defendant was hoping for a very short sentence; that the only thing defendant cared about was getting off; that defendant's case was a "bunch of garbage"; that defendant had committed aggravated

battery upon a prison guard; that the jury had an obligation to consider the victim impact evidence presented; that defendant knew Lillian LaCrosse's children would suffer as a result of the murder; that defendant had decided what he would do in the event the children woke up; that Lillian LaCrosse would trade places with defendant; and that, in the opinion of the prosecutors, there were no mitigating factors sufficient to preclude the imposition of the death penalty.

Every defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor. *Pasch*, 152 Ill. 2d at 184. Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial. *Pasch*, 152 Ill. 2d at 184, citing *People v. Bivens*, 163 Ill. App. 3d 472, 482 (1987). On the other hand, a prosecutor is allowed a great deal of latitude in presenting closing argument. *People v. Buss*, 187 Ill. 2d 144, 244 (1999); *People v. Ramey*, 151 Ill. 2d 498, 554 (1992). The prosecutor has the right to comment on the evidence and to draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant. *People v. Smith*, 177 Ill. 2d 53, 80 (1997). Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks made, the regulation of the substance and style of the argument is within the trial court's discretion. *Pasch*, 152 Ill. 2d at 184-85, citing *People v. Smothers*, 55 Ill. 2d 172, 176 (1973). The trial court may cure errors by giving the jury proper instructions on the law to be applied; informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial; or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark. *People v.*

*Kidd*, 175 Ill. 2d 1 (1996); *Pasch*, 152 Ill. 2d at 185. The trial court's determination of the propriety of the remarks will not be overturned absent an abuse of discretion. *Buss*, 187 Ill. 2d at 244; *Smith*, 177 Ill. 2d at 80.

In evaluating a defendant's claim that the prosecutor's remarks in closing argument were erroneous, a reviewing court must consider the remarks in the context of the parties' closing arguments as a whole. *Buss*, 187 Ill. 2d at 244; *People v. Brown*, 172 Ill. 2d 1, 53 (1996). Moreover, the reviewing court must indulge in every reasonable presumption that the trial judge properly exercised the discretion vested in him. *Ramey*, 151 Ill. 2d at 554. The reviewing court will not disturb the verdict unless it can be said that the remarks resulted in substantial prejudice to the accused (*Buss*, 187 Ill. 2d at 244), such that absent those remarks the verdict would have been different (*Pasch*, 152 Ill. 2d at 185).

In the present case, as to each remark, either trial counsel failed to preserve the alleged error for review or appellate counsel failed to challenge the remark on direct appeal. Waiver applies. However, defendant maintains that trial counsel was ineffective in failing to preserve the errors for review and appellate counsel was ineffective in failing to argue that trial counsel was ineffective. Consequently, the challenged remarks must be reviewed in the context of a *Strickland* ineffective assistance of counsel claim.

Applying these legal principles, we find that defendant has failed to establish prejudice from the remarks. Some of the challenged remarks were based on reasonable inferences from the evidence. See *Smith*, 177 Ill. 2d at 80. Other remarks were forceful argument that the State had proven its case, and not misstatements of the law. See *Simms III*, 168 Ill. 2d at 196-97. Yet other remarks were brief and isolated comments, which did not affect the overall fairness of the sentencing hearing.

See *People v. Emerson*, 189 Ill. 2d 436, 509-10 (2000); *People v. Terrell*, 185 Ill. 2d 467, 513 (1998); *People v. Spreitzer*, 123 Ill. 2d 1, 37-38 (1988). The remarks which might be considered improper were cured by the trial court's sustaining defense objections, informing the jury that arguments are not evidence and must be disregarded if not supported by the evidence, or giving the jury proper instructions on the law to be applied. We conclude defendant has not shown that trial counsel was ineffective in failing to preserve the alleged errors for review, or that appellate counsel was ineffective in failing to challenge the remarks on appeal.

### XII. Abandonment of Defense

Citing *People v. Hattery*, 109 Ill. 2d 449 (1985), defendant maintains that trial counsel failed to subject the prosecution's case to meaningful adversarial testing and, consequently, ineffective assistance of counsel can be presumed without application of the *Strickland* test. At the second stage of the death sentencing hearing, trial counsel made the following statements:

> "*The horror of the acts Darryl committed is beyond dispute.* And I won't take exception to them, I won't cheapen this process by attempting to make excuses. By trying to say that they are anything less than they are.
>
> The fact that Darryl sits here before you, he takes responsibility. He takes responsibility for every single thing he's done in his life. Regardless of what he said, regardless of the things he denied, regardless of how he may have manipulated, regardless of how he's lied, and surely—he has lied—there are no excuses today. Today he sits here before you in judgment. He sits here in judgment for his acts, and possibly final judgment.
>
> * * *
>
> The power you have is awesome, if you think about it. And the circumstances you are in, it is almost irresistible for you to use it. You only have really one choice of what you can do here today. You can put Darryl to death, or you

can do nothing. The way the law works, the way it is presented to you, and what I am asking you to do is nothing. And it is almost inconceivable for me to have to ask you to do that, to sit there and do nothing. After what we have all been through for these last three or four weeks. How can you do nothing? As was Mr. Birkett, as was I am sure everybody in this courtroom, or anybody who has been touched by these proceedings, *we have been moved by what has happened to the LaCrosse family*. I am sure some of you felt rage. *I myself have felt it. It is mind boggling*. The last three weeks, especially for you because you are not a part of this process the way we are, has to be a very, very disorienting experience. We read about these things in the newspaper, we see them on TV. We hear about violence, we hear about the problems we have in this world, but we don't get a view of them like we have in this courtroom.

* * *

And I stand here before you now with the greatest humility, but with utmost sincerity, and tell you not to kill Darryl in this case. In this case it is not right. *And I have very little to put in front of you to ask that*. I have very, very little to put in front of you to make that request. All I have is what is left of Darryl's humanity.

* * *

My task I think is the virtual impossibility of trying to get you to understand something about Darryl. Trying to understand something about his life. About his crimes. About the crimes from where he's coming from. The drugs in his life. The hatred, the fear, the despair.

It is easy, and almost natural, almost natural to want to kill what we hate, and what we fear, and what we don't understand. One of the things you promised us at the beginning of this trial is to keep an open mind. And I ask you to maintain that for a few more moments.

* * *

I ask you please, keep your minds open for a few more minutes. And please, let me try to explain to you something about this process. Let me try to explain to you why Darryl

does have some worth as a human being. And Darryl should not be put to death.

\* \* \*

You have all been qualified that you believe in the death penalty, and under appropriate circumstances you will give the death penalty. You have also been qualified to say that you will not give the death penalty automatically. That you will listen to everything that's been said. No matter how horrible the crime, no matter how disturbing the evidence, you will keep your minds open and listen and determine whether or not you feel you should kill one of your fellow human beings.

You know, coming in here and going through this process, the process we have gone through for the last three or four weeks, is almost in a way like basic training.

\* \* \*

But unlike what we try to accomplish with basic training, even though there are so many similarities in the process, the whole point of why we question you, the whole point of why we bring you here, give you instructions of law, is that when you go into that room to deliberate, we don't just say kill. Irresistible urge. It has to be. But I ask you to think about that. We instruct you by means of the law on how you are to discharge your duty. What are some of your duties in this case? Certainly Darryl has to be punished. Certainly the man has to be punished. And we don't look today for anything other than that. Certainly society needs to be protected from Darryl. Certainly as citizens you want to serve justice. And as the mandate you took when you were sworn as jurors, you must follow the law. To do those duties, ladies and gentlemen, you don't have to kill Darryl.

\* \* \*

I agree with Mr. Birkett, the aggravation in this case speaks for itself. I agree with Mr. Birkett, just on the basis of what you heard, the initial hearing, the qualification hearing, on the basis of what happened to Lillian LaCrosse, *do we have sufficient aggravation to impose the death penalty? No question about it.*

The question is, is there a sufficient mitigating factor. Not an excuse, not a justification, but a sufficient mitigating factor. A reason not to put Darryl to death. And that's why we call you. And this mitigating factor is a personal decision. Each and every one of you who has to decide this case has to decide in your mind if there is a mitigating factor that precludes Darryl being killed.

\* \* \*

But the thing is, if what you see is a mitigating factor, if that's enough, regardless of how much aggravation there is if you see a sufficient reason not to kill Darryl, that is enough. One of you.

\* \* \*

The death penalty is an absolute punishment. Absolute punishment. To give the death penalty we need to be absolutely sure a person is absolutely guilty, and absolutely deserves it. *Of guilt there's no question.* I am not trying to turn cute phrases here. A person has to be absolutely guilty. So we look to mitigation. Reasons why or a reason why Darryl shouldn't be put to death. In 1985, maybe I would have had nothing to say to you. It is eight years later. We know more than we did then.'' (Emphasis added.)

Defendant complains of the italicized statements. He maintains that trial counsel shouldered part of the State's case and joined the State in its effort to have the jury impose the death sentence. He argues that he was effectively abandoned by trial counsel at a crucial time in the death sentencing hearing, and concludes that he was denied the right to effective assistance of counsel.

Defendant concedes this issue has been waived. All the facts needed for consideration of the issue were available on direct review, yet appellate counsel failed to argue that trial counsel was ineffective in representing defendant. In this appeal, defendant contends that appellate counsel was ineffective in failing to argue that defendant had been effectively abandoned by trial counsel at the sentencing hearing. We consider then whether trial and appellate counsel were ineffective.

In *Hattery*, this court considered the defendant's claim that defense counsel's actions at trial were totally inconsistent with the defendant's plea of not guilty and thus constituted a *per se* denial of the right to effective assistance of counsel. Initially, the court observed that defense counsel's strategy at trial is entitled to deference:

> "Although the sixth amendment guarantees criminal defendants the right to the effective assistance of counsel [citation], courts ordinarily will not second-guess defense counsel's judgment and trial strategy. It is recognized that the independence of defense counsel is essential to a fair trial. Moreover, it is also recognized that no two defense attorneys will necessarily agree on the same strategy for a particular case. Therefore, when evaluating ineffectiveness claims, courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ***.' " *Hattery*, 109 Ill. 2d at 460-61.

However, citing *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), the court explained that there are some circumstances so likely to harm the defense that prejudice need not be shown under the *Strickland* test of ineffective assistance of counsel, but will be presumed:

> "In *** [*Cronic*], the court emphasized that the sixth amendment requires, at a bare minimum, that defense counsel act as a true advocate for the accused. Where 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.' " *Hattery*, 109 Ill. 2d at 461.

The court then found that defense counsel had failed to subject the prosecution's case to meaningful adversarial testing, noting that defense counsel conceded the defendant's guilt in opening statement, advanced no theory of defense during the guilt-innocence phase of the trial, presented no evidence of their own, chose not to

make a closing statement to the jury, conceded that the defendant was truthful when he confessed to the murders, and told the jury that the trial was a "death penalty case." *Hattery*, 109 Ill. 2d at 459-60.

In *People v. Johnson*, 128 Ill. 2d 253 (1989), this court explained when it is appropriate to use the *per se* ineffectiveness of counsel rule set forth in *Hattery* and when it is appropriate to require that a defendant show prejudice under the *Strickland* test:

> "Though *Hattery* condemned the practice [of conceding guilt after a not-guilty plea was entered], we did not in that case hold that it is *per se* ineffectiveness whenever the defense attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt but fails to show on the record consent by defendant. This would be especially true when counsel presents a strong defense to the other charges. [Citation.] The examples given in *Cronic* and *Strickland* for when ineffectiveness was established without an inquiry into prejudice were clearly instances where the defendant's sixth amendment right to counsel was violated and such violation could not be tolerated regardless of prejudice. Likewise, in *Hattery* it was clear that the representation fell below acceptable standards and prejudice need not have been established.
>
> *** [T]he rule in *Hattery* must be narrowly construed. [Citation.] Thus, if a concession of guilt is made, ineffectiveness may be established; however, the defendant faces a high burden before he can forsake the two-part *Strickland* test." *Johnson*, 128 Ill. 2d at 269-70.

See also *People v. Chandler*, 129 Ill. 2d 233, 246 (1989).

Trial counsel's actions in the present case stand in sharp contrast to the actions of defense counsel in *Hattery* and do not support a finding of *per se* ineffectiveness of counsel. Trial counsel presented both opening and closing arguments; cross-examined all of the State's witnesses; objected to certain testimony; presented several defense witnesses; and argued successfully that certain evidence should be excluded. Accordingly, we reject

defendant's claim of *per se* ineffective assistance of counsel.

We must, then, consider, in light of the *Strickland* test, whether defendant received ineffective assistance of trial counsel. We conclude that he did not. In arriving at this conclusion, an important factor is that trial counsel did not concede defendant's guilt either during the guilt-innocence phase of defendant's trial or during the eligibility stage of the death sentencing hearing. Indeed, during the eligibility stage, trial counsel maintained that defendant was not eligible for the death penalty; he informed the jury that the State had the burden to prove defendant eligible for the death penalty; and he asked the jury to hold the State strictly to its burden of proof. Furthermore, trial counsel moved for a directed finding regarding eligibility; submitted jury instructions and objected to the State's instructions; presented testimony; and argued in closing that the jury should not find defendant eligible for the death penalty because the evidence did not support a finding that defendant killed Lillian LaCrosse during the course of a felony. Trial counsel even argued there was no evidence of forced entry into the apartment and that testimony that a witness had seen defendant and Lillian LaCrosse speak on several occasions in the three months preceding the murder supported defendant's assertion that he was having an affair with Lillian LaCrosse and they had consensual sex the afternoon of the murder.

The statements defendant complains of were made by trial counsel in closing argument at the second stage of the death sentencing hearing. It is appropriate that we take into consideration the phase of the proceedings at which the challenged conduct takes place. At the second stage of defendant's death sentencing hearing, no question remained of defendant's guilt, his eligibility for the death penalty, and the brutal nature of the murder. The

jury had determined that defendant was over the age of 18 when he committed the crimes, and the State had met its burden of proof by showing, beyond a reasonable doubt, the existence of a statutory aggravating factor. What remained to be done was for the jury to consider the aggravating and mitigating factors to determine whether defendant should be sentenced to death.

Again, trial counsel presented a strong challenge to the State's case. Trial counsel cross-examined the State's witnesses; asked the court to suppress identification testimony and defendant's statements to Officer Mueller and Detective Gorniak; moved for the exclusion of testimony regarding gang-crime evidence and defendant's gang affiliation; and presented mitigation evidence, including the testimony of Dr. Wahlstrom and a mitigation expert, Dr. Sturman. Trial counsel then made an impassioned plea for defendant's life. He argued that the jury should take into consideration defendant's background, including his difficult childhood; the neighborhood in which he grew up; his exposure to gangs at an impressionable age; his alcohol and drug use; and his mental condition at the time of the murder. He argued that defendant had changed for the better during the years spent in prison. He highlighted defendant's relationship with his sons and with his new wife and her daughter, defendant's attempts to complete his education, and defendant's participation in the "scared-straight" program. Trial counsel argued forcefully that defendant could be rehabilitated, that his humanity could be salvaged, and that defendant did not deserve to die.

The statements of which defendant complains, when taken in isolation, as set forth in defendant's brief on appeal, may suggest that trial counsel was ineffective in the closing argument. However, the statements are part of an argument which, transcribed, numbered 65 pages. We have attempted to put the statements in a fuller context.

Our conclusion, upon close examination of the statements, the argument in its entirety, and trial counsel's actions at the death sentencing hearing, is that trial counsel exposed the State's case to the "crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656-57, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045-46. He conceded no more than what was beyond question, and attempted to humanize defendant in an effort to have the jury spare defendant's life. We will not second-guess trial counsel's judgment and strategy.

In light of our conclusion, we also reject defendant's contention that appellate counsel was ineffective in failing to argue on direct review that defendant was denied the effective assistance of trial counsel at the death sentencing hearing.

XIII. Jury Instruction on Life Imprisonment

Defendant signed a waiver of sentencing alternatives in which he requested that the trial court sentence him to natural life in prison in the event the jury should choose not to sentence him to death. Defendant believed that the jury might not sentence him to death if the jury knew that the trial court would sentence defendant to natural life in prison, without possibility of parole. Defendant proposed that the trial court instruct the jury regarding the waiver of sentencing alternatives. The trial court refused the proposed instruction.

In *Simms III*, defendant claimed that the trial court abused its discretion when it refused to instruct the jury that defendant would be sentenced to natural life in prison if he was not sentenced to death. Defendant argued that a waiver of lesser sentences is a form of mitigation, and, since relevant mitigation evidence cannot be barred, he was entitled to make such a waiver. Defendant argued further that, since he had waived his eligibility for any sentence less than natural life in prison, he was entitled to a *Gacho* instruction. See *People v. Gacho*,

122 Ill. 2d 221, 262 (1988). This court stated that a *Gacho* instruction is required in a capital sentencing hearing where a sentence of natural life in prison is the only available alternative to the death penalty. However, a *Gacho* instruction is unavailable where, as here, a defendant is statutorily eligible for a sentence less than natural life in prison. *Simms III*, 168 Ill. 2d at 198-99; see *People v. Macri*, 185 Ill. 2d 1, 73-74 (1998); *People v. Simpson*, 172 Ill. 2d 117, 150-51 (1996); *Howard*, 147 Ill. 2d at 169-70. Thus, the court concluded the trial court did not commit error in refusing defendant's proposed instruction. *Simms III*, 168 Ill. 2d at 198-99.

In his amended petition, defendant highlights the State's argument at the death sentencing hearing that defendant was hoping for a short sentence. Defendant maintains that he was entitled to rebut the State's argument by informing the jury that he would receive a sentence of natural life in prison, without possibility of parole. Defendant also argues that a waiver of lesser sentences is mitigation because it may serve as a basis for a sentence less than death. Defendant concludes the trial court should have allowed the proposed instruction.

We reject this argument, finding that it is a rephrasing of the argument decided adversely to defendant in *Simms III*. A post-conviction petitioner may not avoid the bar of *res judicata* simply by rephrasing issues previously addressed on direct appeal. *Williams*, 186 Ill. 2d at 62. As this court held in *Simms III*, a waiver of lesser sentences is not mitigation. Further, defendant was not entitled to a *Gacho* instruction. It matters not that, in support of his contentions, defendant makes the additional argument he was entitled to the instruction because the waiver of lesser sentences could have been used to rebut the State's argument regarding a short sentence. See *Macri*, 185 Ill. 2d at 75 (rejecting defendant's argument that he was constitutionally entitled to

a *Gacho* instruction because the State argued that defendant's future dangerousness was a reason to impose a sentence of death); *People v. Simpson*, 172 Ill. 2d at 150-51 (1996) (rejecting defendant's argument that he was entitled to a *Gacho* instruction because the State raised the issue of defendant's prior criminal record and his commission of crimes after being paroled).

We also reject defendant's contention that appellate counsel was ineffective because he failed to argue on direct appeal that the waiver of lesser sentences was mitigation evidence. Since this court held in *Simms III* that a waiver of lesser sentences is not mitigation, appellate counsel was not ineffective for failing to argue that a waiver of lesser sentences is mitigation.

### XIV. Jury Instruction on Alternate Sentences

In a related argument, defendant maintains he was denied a fair, reliable and accurate death sentencing hearing because the trial court failed to instruct the jury about the other possible sentences defendant could have received if not sentenced to death, thus depriving defendant of an opportunity to rebut the State's argument that defendant was hoping for a very short sentence. Trial counsel submitted, but later withdrew, an instruction listing the other possible sentences, setting forth information regarding good-conduct credit and advising the jury that parole was unavailable. Defendant contends that trial counsel was ineffective because he withdrew the proposed instruction, and appellate counsel was ineffective because he failed to argue on direct appeal that trial counsel was ineffective.

All of the facts needed to raise this issue were present in the record and available on direct appeal. The issue is thus waived. *Evans*, 186 Ill. 2d at 92. However, we consider the merits of the issue because defendant maintains that trial and appellate counsel were ineffective. *Lear*, 175 Ill. 2d at 278.

In *Simms II*, defendant argued the trial court should have instructed the jury that, if not sentenced to death, defendant would receive either a fixed term of 20 to 80 years' imprisonment or a life sentence without the possibility of parole. The trial court had refused defendant's proposed instruction and instead instructed the jury that, if it determined a death sentence was inappropriate, the court would impose a sentence other than death. Citing *People v. Albanese*, 102 Ill. 2d 54, 81 (1984), this court held that, where a defendant's eligibility for death is not predicated upon multiple murder convictions, it is proper for the trial court to instruct the sentencing jury that the alternative to death is a prison term, without specifying that the term is life imprisonment. *Simms II*, 143 Ill. 2d at 180. The court explained that the sentencing jury is responsible for determining only whether the death penalty is warranted, not the severity of the prison sentence if the death sentence is found inappropriate. *Simms II*, 143 Ill. 2d at 180.

The court then considered defendant's argument that, without information regarding the other possible sentences, the jurors could have believed defendant would be released in a few years and, thus, be more inclined to sentence him to death. The court rejected this argument, observing:

"[T]he trial court would have to explain our State's entire determinate sentencing system before the jury would be fully informed about the alternative sentences the defendant could receive if not sentenced to death. The jury could fairly and accurately compare the death sentence to alternative sentences of imprisonment only if it was instructed that the defendant could be released from prison before he served the full sentence imposed, either [through] executive clemency or by earning good-conduct credits provided for by the rules of the Department of Corrections. [Citations.] We have repeatedly held, however, that it is improper to inform a jury about the possibility that a defendant may be paroled before serving his full sentence.

Such information diverts the jury's attention from the character of the offender and the circumstances of his offense and focuses it upon a speculative possibility that may or may not occur." *Simms II*, 143 Ill. 2d at 181-82.

In these proceedings, defendant maintains that *Simms II* is not controlling. He reasons that the court in *Simms II* did not consider whether a jury instruction on other possible sentences must be given where, as here, it is necessary to rebut the State's contention that the defendant is trying to obtain a short sentence. We must disagree. This court held in *Simms II* that a defendant is not entitled to an instruction on the possible terms of imprisonment he might receive if not sentenced to death. In particular, this court rejected defendant's argument that such an instruction was needed to dispel the jurors' belief that defendant would be released after serving a short sentence. Defendant's current argument, that the instruction was needed to counter the inference he sought a short sentence, is a mere rephrasing of his argument in *Simms II*.

In addition, we note that the trial court sustained trial counsel's objection to the State's remark regarding the sentence defendant hoped to receive. We must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *Simms II*, 143 Ill. 2d at 174.

We also doubt that defendant could have used the jury instruction to effectively refute the argument he was seeking a short sentence. The instruction would have informed the jury that the trial court might sentence defendant to 20 years' imprisonment. Further, the instruction would have informed the jury that defendant would be entitled to one day of good-conduct credit for each day in prison, and an award of 90 days' additional good-conduct credit for meritorious service. Assuming defendant received a sentence of 20 years' imprisonment, and the maximum credit for good conduct and meritorious

service, the instruction would have informed the jury that defendant could be released from prison in less than 10 years. Far from refuting the argument regarding a short sentence, such an instruction might lead the jury to harbor serious misgivings regarding the imposition of a sentence other than death.

For the reasons discussed above, we reject defendant's contention that trial counsel was ineffective because he withdrew the proposed instruction on the available sentences. Defendant was not entitled to such an instruction. Further, there is no reasonable probability that, but for trial counsel's alleged error in withdrawing the jury instruction, the result of the death sentencing hearing would have been different. We also reject defendant's contention that appellate counsel was ineffective because he failed to argue on direct appeal trial counsel's ineffectiveness. Since defendant was not prejudiced by the withdrawal of the jury instruction, he could not have been prejudiced by appellate counsel's failure to raise this issue on direct review. See *Griffin*, 178 Ill. 2d at 82.

### XV. Jury Instruction on Unanimity, Mitigating Factors

In his amended petition, defendant argues that he was denied a fair and reliable sentencing hearing because the trial court refused to instruct the jury as defendant proposed. The proposed instructions were as follows:

"[No. 5] If you are not persuaded either that there are no mitigating factors sufficient to preclude imposition of a death sentence or that there are mitigating factors sufficient to preclude imposition of a death sentence, you are required to sign the verdict form directing the court to impose a sentence other than death."

"[No. 7] If one or more of you believe that the death penalty should not be imposed then sign the appropriate verdict form."

The trial court refused to give these instructions. Instead the trial court instructed the jury as follows:

"Under the law, the defendant shall be sentenced to death if you unanimously find that there is not a mitigating factor sufficient to preclude imposition of a death sentence.

If you are unable to find unanimously that there is not a mitigating factor sufficient to preclude imposition of a death sentence, the Court will impose a sentence other than death." See Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed. 1992) (hereinafter IPI Criminal 3d).

"If you do not unanimously find from your consideration of all the evidence that there is not a mitigating factor sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the Court to impose a sentence other than death." See IPI Criminal 3d No. 7C.06.

At the outset, we note that appellate counsel did not raise this issue on direct review. Waiver applies. *Evans*, 186 Ill. 2d at 92. However, defendant argues that appellate counsel was ineffective in failing to raise this issue on appeal. Consequently, we must determine whether appellate counsel's failure to raise the issue was objectively unreasonable and prejudiced defendant. *West*, 187 Ill. 2d at 435.

A defendant is entitled, as is the State, to the submission of appropriate jury instructions on the law that applies to his theory of the case if there is evidence in the record to support that theory. However, it is for the trial court to determine, after considering the facts and the governing law, whether the jury should be instructed on a particular subject. If an appropriate IPI instruction exists, it must be used. *Gilliam*, 172 Ill. 2d at 519.

The decision whether to give a non-IPI instruction rests within the sound discretion of the trial court. The trial court abuses its discretion in refusing a non-IPI instruction only where there is no IPI instruction that applies to the particular subject. Conversely, a trial court does not abuse its discretion by refusing to give a non-IPI instruction if there is an applicable IPI instruction or the essence of the refused instruction is covered by other

given instructions. *Gilliam*, 172 Ill. 2d at 519. See also *Buss*, 187 Ill. 2d 144.

Defendant's Instruction No. 5 and Instruction No. 7 are non-IPI instructions. The trial court properly submitted to the jury IPI Criminal 3d No. 7C.05 and IPI Criminal 3d No. 7C.06, which accurately state the law. Thus, the trial court did not abuse its discretion in refusing defendant's Instruction No. 5 and Instruction No. 7. It follows that appellate counsel was not ineffective in failing to raise this issue on appeal. See *Macri*, 185 Ill. 2d at 70-71.

Next defendant complains that the trial court should have given defendant's Instruction No. 8: "A juror may consider a mitigating factor even though all or some of the other jurors do not believe that the mitigating factor exists." Once more, appellate counsel did not raise this issue on direct review. However, defendant maintains appellate counsel was ineffective in failing to raise the issue. We disagree.

In *People v. Hope*, 168 Ill. 2d 1, 44-46 (1995), the trial court had refused a similar defense instruction and, instead, given the jury IPI Criminal 3d No. 7C.06. On appeal, this court rejected the defendant's contention that the trial court erred in refusing his requested instruction. The court opined that the jury instruction given did not convey the impression that unanimity was required before a mitigating factor could be considered. Rather, the instruction and argument in the case adequately informed the jury that unanimity was not required to find a mitigating factor sufficient to preclude death. *Hope*, 168 Ill. 2d at 45; see also *People v. Miller*, 173 Ill. 2d 167, 197-98 (1996); *Brown*, 172 Ill. 2d at 58-59; *Fields*, 135 Ill. 2d at 70.

In the present case, the jury was given IPI Criminal 3d No. 7C.06, the same instruction given in *Hope*. The instruction adequately informed the jury that unanimity

was not required to find a mitigating factor sufficient to preclude death. In addition, during closing argument, trial counsel repeatedly stressed that each juror had the power to prevent the imposition of the death penalty and spare defendant's life. Thus, we conclude that the jury was given appropriate information regarding the consideration of mitigating factors. The trial court did not err in refusing defendant's Instruction No. 8, and appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Lastly, defendant maintains that the trial court erred in refusing defendant's Instruction No. 6 and Instruction No. 4b. Defendant's Instruction No. 6 stated: "You may consider as a mitigating factor the defendant's background and the facts surrounding the offense even though the mitigating factor is not specifically listed in these instructions. You should not give less weight to a mitigating factor merely because it is not specifically listed in these instructions." Defendant's Instruction No. 4b defined the term "aggravating factor" and contained a list of aggravating factors. The instruction also defined the term "mitigating factor" and contained a list of statutory mitigating factors and nonstatutory mitigating factors. The nonstatutory mitigating factors were that defendant was physically abused in his life, lived in poverty, did good deeds in his life, has an improving prison record, and has a good school record; and any other reason supported by the evidence why defendant should not be sentenced to death.

As noted above, the trial court refused to give defendant's Instruction No. 6 and Instruction No. 4b. Instead, the trial court gave an instruction to the jury which contained the same definitions of aggravating factors and mitigating factors, and the same list of aggravating factors and statutory mitigating factors as found in defendant's Instruction No. 4b. In addition, the instruc-

tion stated that mitigating factors include: "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." Defendant maintains that the trial court should have given to the jury his list of nonstatutory mitigating factors noted above.

As with the other instruction issues, appellate counsel failed to argue on direct review that the trial court erred in refusing to give defendant's Instruction No. 6 and Instruction No. 4b. However, defendant argues that appellate counsel was ineffective in failing to raise the issue on direct appeal. Thus, we consider whether counsel's representation was ineffective.

This court has previously held that nonstatutory mitigating factors need not be specified in an instruction so long as the jury is instructed that it may consider all potential mitigating circumstances. *Brown*, 172 Ill. 2d at 58; *Hope*, 168 Ill. 2d at 43-44; *Fields*, 135 Ill. 2d at 74. Here, the trial court instructed the jury that mitigating factors included any other reason supported by the evidence. Consequently, the trial court did not err in refusing to include a list of nonstatutory mitigating factors in the instructions to the jury. It follows that defendant was not prejudiced by appellate counsel's failure to raise this issue on direct appeal.

### XVI. Right of Allocution

At the death sentencing hearing, the trial court denied defendant's request to address the jury in allocution. Defendant notes that noncapital defendants have the right to speak in allocution. Defendant also notes that the trial judges in *Smith*, 177 Ill. 2d 53, and *People v. Shatner*, 174 Ill. 2d 133 (1996), allowed capital defendants to speak in allocution at their bench trials. Defendant concludes that he has been denied the equal protection of the laws.

In his post-trial motion, defendant challenged the trial court's denial of his request to speak to the jury in

allocution. However, appellate counsel did not raise this issue on direct appeal. Since all the facts needed to raise the issue were of record, waiver applies. *Guest*, 166 Ill. 2d at 390. Defendant contends, however, that appellate counsel was ineffective in failing to raise this claim on appeal. Consequently, we consider the merits of the issue.

This court has held consistently that a capital defendant does not have either a statutory or a constitutional right to address the judge or jury in allocution in a capital sentencing hearing. *People v. Brown*, 185 Ill. 2d 229, 259 (1998); *People v. Oaks*, 169 Ill. 2d 409, 470 (1996); *People v. Fair*, 159 Ill. 2d 51, 94 (1994); *People v. Childress*, 158 Ill. 2d 275, 307-08 (1994); *People v. Tenner*, 157 Ill. 2d 341, 382 (1993); *People v. Kokoraleis*, 132 Ill. 2d 235, 280-82 (1989); *People v. Szabo*, 113 Ill. 2d 83, 95 (1986). In addition, this court has held that allowing allocution in noncapital sentencing proceedings (see Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a)(5)) while disallowing it in capital sentencing proceedings does not deny capital defendants equal protection. *Brown*, 185 Ill. 2d at 259-60; *People v. Christiansen*, 116 Ill. 2d 96, 127-29 (1987); *People v. Gaines*, 88 Ill. 2d 342, 374-80 (1981).

We recognize that capital defendants have sometimes been allowed to speak in allocution at their bench trials. However, this court has not endorsed the actions of the trial judges who have allowed capital defendants to speak in allocution. To the contrary, in *Brown*, 185 Ill. 2d at 260, this court rejected the defendant's argument that the trial judge should have allowed him to speak in allocution at the conclusion of his bench trial because the trial judge had allowed a codefendant to speak in allocution at the conclusion of the codefendant's separate death sentencing hearing. The court expressed its belief that the judge's apparent inconsistency in allowing allocution in another case did not unfairly penalize the defendant,

and held that the judge acted properly in denying the defendant's request to address the court.

Consistent with this line of authority, we cannot find appellate counsel ineffective for failing to raise this issue on direct appeal.

### XVII. Death Sentence Excessive

Next, defendant maintains that his death sentence is excessive and should be vacated. At the outset, we note that appellate counsel did not raise this issue on direct appeal. Thus, waiver applies. Defendant maintains, however, that appellate counsel was ineffective in failing to raise this issue on appeal. Consequently, we consider this issue on the merits.

In determining whether a death sentence is proper in a particular case, we must consider the character and record of the individual offender. *Shatner*, 174 Ill. 2d at 161; *People v. Towns*, 182 Ill. 2d 491, 519 (1998). Each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty. *Johnson*, 128 Ill. 2d at 280. As such, this court has determined that, when reviewing a death sentence, it will make a separate evaluation of the record, but it will not lightly overturn the jury's findings made during the aggravation and mitigation phase of the death sentencing hearing when they are amply supported by the record. *Pasch*, 152 Ill. 2d at 201; *Christiansen*, 116 Ill. 2d at 122.

The record shows that Lillian LaCrosse had complained that, over a two-month period preceding her death, defendant had been harassing her by asking her for dates. She was afraid of defendant. On the evening of April 17, 1985, the outer door to Lillian LaCrosse's apartment building was open because Commonwealth Edison personnel were working on restoring the electricity. De-

fendant entered Lillian LaCrosse's apartment without authorization. Bloodstains on the front door of the apartment and defense wounds on her hands evinced a struggle between Lillian LaCrosse and defendant. Defendant, armed with two different weapons, stabbed Lillian LaCrosse at least 25 times in the ear, shoulder, throat, chest, arms and back. Defendant also strangled and sexually assaulted Lillian LaCrosse. She died from a loss of blood.

Defendant, thereafter, stole Lillian LaCrosse's purse, a movie camera she had borrowed from her parents and a pair of her jeans. Lillian LaCrosse's husband discovered her body on the dining room floor when he returned home from work. Her three children, ranging in age from 2 to 4 years, were crying in their bedroom; the phone had been taken off the hook.

The State also introduced evidence of defendant's criminal record at the aggravation-mitigation stage of the hearing. He had twice been adjudicated delinquent and his juvenile criminal history included theft from school lockers after cutting the locks off; setting his school on fire; residential burglary; auto theft; burglary of a church; and possession of a firearm. His adult criminal activity included burglary of a laundromat in May 1980; a second burglary in May 1981; attempted auto theft; possession of a stolen motor vehicle; and unlawful possession of a weapon.

On behalf of the State, two women[3] testified regarding previous contacts with defendant. Sharon Williams was 16 years old in August 1980 when she agreed to go on a date with defendant, then 19 years old. Defendant, along with two male friends, picked her up. She got into the backseat of the car with defendant, who subsequently

---

[3]We have omitted all references to testimony given by Matas, Detective Mueller and Mogavero in light of our holding on the perjury issue.

forced her, at knifepoint, to have sexual intercourse. Defendant was charged with contributing to the delinquency of a minor.

Sandra Sender stated that defendant, a friend of her ex-husband, came to her apartment on May 26, 1983, on the pretext of talking with her about her car. After she let him inside, he pulled a knife and strangled her. She passed out. When she regained consciousness, defendant took her to the bedroom, threw her onto the bed and strangled her again. She passed out once more. When she regained consciousness, defendant was having sexual intercourse with her. Subsequently, she distracted defendant long enough to flee the building and obtain help. Defendant was charged with attempted murder and unlawful restraint and pled guilty to aggravated battery.

The State also presented evidence regarding defendant's behavior in prison. Several witnesses testified regarding defendant's gang affiliation and various infractions of prison regulations. Attorney Zellner testified that, while meeting with a client at Pontiac in the fall of 1991, she observed defendant hit his wife in the face and force her to perform oral sex on him in the prison visiting room. Defendant's prison behavior also included beating another inmate, and throwing hot liquid on the head, face and forearm of a prison guard.

In mitigation, defendant presented evidence of his difficult childhood. His natural father left the house when he was a child. His mother remarried when he was 10 years old. Defendant was beaten by his stepfather, and not disciplined by his mother. He grew up in a low-income, high-crime neighborhood in Chicago and began to use drugs and alcohol at a relatively young age. When defendant was about 16 years old, his mother moved and he then lived with an older sister.

Several witnesses testified regarding the laundromat burglary on May 6, 1980. Defendant was bitten by a po-

lice dog when police responded to the burglary. Defendant suffered a tear to the foreskin of his penis, and a puncture wound to his thigh. Defendant married Lydia Smith on June 14, 1980. She testified that defendant did not have normal intercourse with her for several months after the dog-bite incident. He became very aggressive, short-tempered, subdued, and his drug use increased. Lydia Smith stopped living with defendant in 1983, when he was incarcerated for a burglary. She divorced defendant in 1985. Although defendant did not pay child support, he maintained regular contact with his two children. Defendant and his current wife, Christine Simms, married while he was in prison. According to her, defendant has changed for the better in the past few years and is very loving and supportive of her and her daughter. Christine Simms denied that defendant hit her on any of her visits to the prison, or forced her to perform oral sex in the visiting room.

Defendant also presented mitigation evidence that he had assisted in a program for juvenile delinquents. On four occasions, he spoke to groups of youth offenders and encouraged the youths to stay out of trouble. According to the program director and a juvenile who heard him speak, defendant's participation has had a positive influence on the juveniles. While in prison, defendant got his GED and showed interest in taking college courses.

Dr. Wahlstrom examined defendant in September 1993. He testified that in 1985 defendant suffered from an antisocial personality disorder, as well as from post-traumatic stress disorder, in partial remission, stemming from the dog-bite incident. Defendant also suffered from drug and alcohol dependence. Finally, Dr. John Sturman testified that defendant had changed for the better while in prison.

In light of the mitigation presented, defendant maintains that his sentence must be vacated, consistent

with this court's holding in *Johnson*, 128 Ill. 2d 253, *People v. Buggs*, 112 Ill. 2d 284 (1986), and *People v. Carlson*, 79 Ill. 2d 564 (1980). We disagree. The decisions to vacate the defendants' death sentences in those cases were based on mitigating factors that are not present in this case. Thus, in *Johnson*, the defendant returned to his place of employment nine days after he was fired to collect his final paycheck. The defendant was told that there was no paycheck for him. The defendant shot the supervisor who had fired him, shot and stabbed one of his former coworkers, and shot and killed another former coworker. On the day of the offenses, the defendant had used alcohol, cocaine, and marijuana laced with the drug "PCP." This court vacated the defendant's death sentence because of his good character, steady employment history, and insignificant criminal record. The court found that an isolated stressful event led to the crimes, concluding that the crimes had occurred only because the defendant had just been fired and believed that he had been deprived of his final paycheck. See *Johnson*, 128 Ill. 2d 253.

In *Buggs*, the defendant and his wife argued after she received a telephone call from one of her boyfriends. During the argument, she told the defendant that he was not the father of two of her sons. The defendant became outraged; poured gasoline on his wife, the hallway and the stairway; threw a lit match on the stairs; and fled. The defendant's wife and son died in the fire. This court vacated the defendant's death sentence because he had served 21 years in the military and been honorably discharged; he had no history of serious criminal activity; he had a drinking problem; and he had been experiencing marital difficulties which, in fact, triggered the dispute leading to the murders. *Buggs*, 112 Ill. 2d at 293-95.

In *Carlson*, the defendant, recently divorced, had

moved out of the marital home, but continued seeing his former wife with a view to remarriage. The defendant had not contested the divorce upon his former wife's agreement not to entertain men at the marital home. On the day of the murders, the defendant and his former wife argued over her relationship with other men. The defendant shot his former wife, poured gasoline throughout her house, and set the house on fire. The defendant then went to a bar and tried to contact his daughter by telephone so he could give her money for his son's support. Since he was unable to contact her, he gave a coworker a large sum of money in an envelope with instructions to give the envelope to the daughter for the son's use. When the police arrived to arrest him at the bar, the defendant killed one of the officers. This court found that the defendant had no significant history of prior criminal activity, and had acted under an extreme emotional disturbance exacerbated by his very poor physical and emotional health. This court also stated that the defendant's concern for his son was a mitigating factor. *Carlson*, 79 Ill. 2d at 587-91.

The mitigating factors in *Johnson*, *Buggs*, and *Carlson* are absent in the present case. Thus, we are not inclined to vacate defendant's death sentence. Instead, we find ample support for the jury's verdict in the brutal nature of the murder; defendant's generous criminal record; his negative sexual contacts with Sandra Sender and Sharon Williams; his gang affiliation; his violent behavior in prison; and the many infractions of prison regulations. In addition, the record contains evidence contradicting some of the mitigation testimony. For example, Lydia Smith testified that defendant drank alcohol in moderation; was not addicted to any particular drug; and chose when to use drugs. Defendant's sexual contact with Sharon Williams occurred a scant three months after the dog-bite incident, which, allegedly, prevented him from

having normal sexual intercourse with Lydia Smith. Various psychiatrists who examined defendant found no evidence of psychopathy, and a report prepared by one psychiatrist noted that defendant denied any psychiatric problems. Lastly, Dr. Wahlstrom could not testify to a direct correlation between the disorders he diagnosed and the murder of Lillian LaCrosse. In light of the record, we decline to overturn the jury's findings made during the aggravation-mitigation stage of the death sentencing hearing. Accordingly, we find that appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Defendant next argues that the Du Page County State's Attorney acted arbitrarily in seeking the death penalty in the present case but not in the case of *People v. Hernandez*, 204 Ill. App. 3d 732 (1990). Defendant invites a comparison of the facts of his case with the facts in *Hernandez*, and suggests that this court vacate his death sentence in order to rectify "the arbitrariness" evinced by the Du Page County State's Attorney in seeking the death penalty against him.

We note, at the outset, that defendant did not raise this argument in the trial court or on direct appeal. Defendant acknowledges the waiver, but posits that trial counsel was ineffective for failing to raise this claim in the trial court and appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. Consequently, we consider the issue on its merits.

We have repeatedly rejected the argument that the Illinois death penalty statute is unconstitutional because of the discretion it gives the prosecutor in deciding whether to seek the death penalty in a particular case. *People v. Heard*, 187 Ill. 2d 36, 89 (1999); *People v. Cloutier*, 178 Ill. 2d 141, 173-74 (1997); *Kidd*, 175 Ill. 2d at 55; *Kokoraleis*, 132 Ill. 2d at 291. Furthermore, the very fact that the prosecutor is afforded a measure of discre-

tion under the death penalty statute entails that the prosecutor will seek the death penalty in one case and not in another. The prosecutor may decide to do so based upon the strength of the evidence, the circumstances of the crime, the accused's rehabilitative potential, the availability and credibility of witnesses, and any number of legitimate factors.

In the present case, there was a statutory aggravating factor, murder committed in the course of an armed robbery and aggravated criminal sexual assault, to warrant a request for a death penalty hearing. Defendant has not shown that the Du Page County State's Attorney's decision to seek the death penalty against him was based on circumstances other than the presence of the statutory aggravating factor, the strength of the evidence against him, his substantial criminal history, and his demonstrated lack of rehabilitative potential as evidenced by numerous prison infractions. Moreover, our review of the record has not uncovered any evidence to support the contention that the State's Attorney considered impermissible factors in arriving at his charging decision.

The only support advanced by defendant for the contention that the State's Attorney acted improperly is the State's Attorney's decision not to seek the death penalty against Hernandez. Such is insufficient, however, to support an inference that the State's Attorney was improperly motivated in seeking the death penalty in the present case. See *McCleskey v. Kemp*, 481 U.S. 279, 306-07, 95 L. Ed. 2d 262, 287-88, 107 S. Ct. 1756, 1774-75 (1987); *People v. Stewart*, 121 Ill. 2d 93, 110-12 (1988); *People v. Foster*, 119 Ill. 2d 69, 90-93 (1987); *People v. Free*, 112 Ill. 2d 154, 160-63 (1986).

Defendant has failed to supply this court with evidence that the State's Attorney acted improperly in seeking the death penalty against him. Absent such proof, we

will not assume that the State's Attorney's decision in seeking the death penalty against defendant was "based on whim or caprice or otherwise invoke[d] impermissible considerations." *Stewart*, 121 Ill. 2d at 112. Accordingly, we conclude that defendant's death sentence was not imposed arbitrarily or capriciously. Furthermore, we conclude that defendant's death sentence was not exces-, sive. In light of these conclusions, we find that trial and appellate counsel were not ineffective for failing to argue that the State's Attorney acted arbitrarily in seeking the death penalty against defendant, and appellate counsel was not ineffective for failing to argue that defendant's death sentence was excessive.

### XVIII. Multiple Death Sentences and Delay in Execution

Defendant next raises constitutional objections to his death sentence and its implementation. In *Simms II*, this court vacated defendant's death sentence and remanded for a new death sentencing hearing because the jury had been instructed erroneously that residential burglary could be the predicate felony for the imposition of the death penalty under section 9—1(b)(6) of the Criminal Code of 1961. *Simms II*, 143 Ill. 2d 154. On May 27, 1992, defendant filed a motion asking the trial court to bar the death sentencing hearing pursuant to the fifth, eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, VIII, XIV). Defendant maintained that principles of double jeopardy applied to bar a new death sentencing hearing. Defendant also argued that the trial court should bar the death sentencing hearing because of the State's misconduct in submitting erroneous instructions to the court. The trial court denied the motion, and defendant appealed to this court.

On September 16, 1992, this court dismissed defendant's appeal "as patently without merit," and remanded the cause to the trial court with directions to proceed

with the death sentencing hearing. This court thus determined that a new death sentencing hearing should not be barred on principles of double jeopardy, and rejected defendant's argument that the State should forgo the hearing because of prosecutorial misconduct.

In the present appeal, defendant contends that sentencing him to death on three occasions is a violation of the double jeopardy clause and permits the State to continue to engage in continuing prosecutorial misconduct to secure a sentence of death. Defendant also argues that the delay in carrying out the death sentence constitutes cruel and unusual punishment. We have heretofore addressed defendant's double jeopardy and prosecutorial misconduct claims and will not reconsider these claims.

We turn, then, to the additional argument that the delay in the execution of the death sentence constitutes cruel and unusual punishment. As noted above, in 1985, defendant was sentenced to death for the murder of Lillian LaCrosse. This court affirmed defendant's convictions but vacated defendant's death sentence and remanded for a new death sentencing hearing. See *Simms I*, 121 Ill. 2d 259. Thereafter, defendant was twice resentenced to death. In 1995, this court affirmed defendant's death sentence. See *Simms III*, 168 Ill. 2d 176. The post-conviction proceedings have caused an additional delay of five years in the execution of the death sentence.

Defendant concedes that this claim has been waived. However, defendant argues that trial counsel was ineffective in not raising this claim and appellate counsel was ineffective in failing to argue the ineffectiveness of trial counsel.

This court has not previously considered whether, in general, executing a defendant after a delay occasioned by the appeal process and/or post-conviction proceedings

constitutes cruel and unusual punishment.[4] However, this issue has been considered, and rejected by several other courts. We agree with the reasoning of these courts.

In *Chambers v. Bowesox*, 157 F.3d 560 (8th Cir. 1998), the court discussed the origins of the delay argument and its success since 1993 in commonwealth countries. The court then distinguished our legal system and observed that the delays generated by our system of appeals are a function of our courts' desire to address any argument that might save the defendant's life:

> "The essential point for our purposes, of course, is whether or not the Eighth Amendment is being violated. We believe that delay in capital cases is too long. But delay, in large part, is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life. Chambers's strongest argument is that the State has had to try him three times before getting it right. That is true, but there is no evidence, not even a claim, that the State has deliberately sought to convict Chambers invalidly in order to prolong the time before it could secure a valid conviction and execute him. We believe the State has been attempting in good faith to enforce its laws. Delay has come about because Chambers, of course with justification, has contested the judgments against him, and, on two occasions, has done so successfully." *Chambers*, 157 F.3d at 570.

The reasoning of the Ninth Circuit is also instructive:

> "In *Richmond v. Lewis*, 948 F.2d 1473 (9th Cir. 1990), *rev'd on other grounds*, 506 U.S. 40, 113 S. Ct. 528, 121 L.

---

[4]This issue was raised in *Emerson*, 189 Ill. 2d at 515. There, we stated that the defendant had failed to persuade us we should decide that the passage of time between the offense and the imposition of the death penalty in his case caused his punishment to be cruel and unusual. Given the fact that a second defendant is raising this same issue, and others are likely to adopt this argument, we have decided to consider at this time whether the issue presents a valid constitutional challenge.

Ed. 2d 411 (1992), *vacated*, 986 F.2d 1583 (9th Cir. 1993), we rejected a very similar argument. We reasoned that:

> A defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights. It would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place. If that were the law, death-row inmates would be able to avoid their sentences simply by delaying proceedings beyond some threshold amount of time, while other death-row inmates—less successful in their attempts to delay— would be forced to face their sentences. Such differential treatment would be far more 'arbitrary and unfair' and 'Cruel and unusual' than the current system of fulfilling sentences when the last in the line of appeals fails on the merits. We thus decline to recognize Richmond's lengthy incarceration on death row during the pendency of his appeals as substantively and independently violative of the Constitution.

*Id.* at 1491-92. Although the opinion was subsequently vacated, *Richmond* remains persuasive authority, and we adopt its analysis of this issue as our own." *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) (*en banc*). See also *Stafford v. Ward*, 59 F.3d 1025 (10th Cir. 1995); *Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995); *McKinney v. State*, 133 Idaho 695, 701-03, 992 P.2d 144, 150-52 (1999).

We conclude that a delay in the execution of the death sentence occasioned by the appeal process and/or post-conviction proceedings does not constitute cruel and unusual punishment.

In this case, was trial counsel ineffective in failing to argue at the third death sentencing hearing that the delay in the execution of the death sentence constituted cruel and unusual punishment? We think not. Defendant has not cited, nor are we aware of, any cases in our juris-

prudence supporting the argument that a delay in execution of a death sentence occasioned by the appeal process and/or post-conviction proceedings is cruel and unusual punishment. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Given the lack of support for defendant's position, we cannot agree that trial counsel's performance was deficient. We also conclude that appellate counsel was not ineffective in failing to raise this issue on appeal given the lack of support for defendant's position and our determination that such a delay does not constitute cruel and unusual punishment.

### XIX. Constitutionality of Death Penalty

Defendant challenges the constitutionality of the Illinois death penalty. He argues that the death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g)) is unconstitutional because the State does not carry a burden of persuasion at the second stage of the death penalty hearing. He asserts that a defendant who is convicted and then proved beyond a reasonable doubt to be eligible for the death penalty will mandatorily receive the death penalty if he chooses to stand idly by. He maintains that the result of this statutory scheme is to place a burden on the defendant which has not been authorized by the legislature, in violation of the defendant's constitutional rights.

We have previously considered and rejected this argument. *Brown*, 172 Ill. 2d at 62-63; *Simpson*, 172 Ill. 2d at 152; *Terrell*, 132 Ill. 2d at 227; *Christiansen*, 116 Ill. 2d at 130; *Williams*, 97 Ill. 2d at 265-66. We adhere to our prior decisions.

### XX. Cumulative Effect of Errors

As evidenced by the length of this opinion, defen-

dant's amended post-conviction petition contains allegations of numerous errors at his death sentencing hearing. Defendant claims that he was deprived of a fair trial and reliable sentencing hearing because of the cumulative effect of these errors. We have examined each allegation, and, with the exception of one, have found no error where so claimed. We do not believe we should assign any weight to these allegations of error. Consequently, there remains only the allegation that certain witnesses committed perjury at the death sentencing hearing. Since we are remanding this cause for a hearing on the allegations of perjury, the trial court will determine whether this claim is meritorious and should lead to a new death sentencing hearing.

## CONCLUSION

For the aforementioned reasons, the judgment of the circuit court of Du Page County dismissing defendant's post-conviction petition without an evidentiary hearing is affirmed in part and reversed in part. The circuit court is instructed to hold an evidentiary hearing with respect to the allegations of perjury. As to the dismissal of the remaining allegations, the circuit court's order is affirmed.

*Judgment affirmed in part*
*and reversed in part;*
*cause remanded.*

CHIEF JUSTICE HARRISON, dissenting:

The murder for which defendant was convicted took place over 15 years ago. During the decade and a half between then and now, the State has repeatedly attempted to have defendant sentenced to death. Its efforts have repeatedly failed. Although death sentences have been imposed, our court has had to set them aside based on trial error. *People v. Simms*, 121 Ill. 2d 259 (1988) (*Simms I*); *People v. Simms*, 143 Ill. 2d 154 (1991) (*Simms II*).

Depending on what the evidentiary hearing discloses on remand, our court may have to do so again. If the State's witnesses lied, as defendant alleges, defendant's present death sentence is invalid and cannot be allowed to stand.

The process which has brought this case to where it is today has been extraordinarily protracted. Defendant was first convicted and sentenced to death in late 1985. He was placed on death row and remains there today, a decade and a half later. By the standards in effect when the United States Constitution was ratified, such a delay would have been rare, if not unheard of. See *Lackey v. Texas*, 514 U.S. 1045, 131 L. Ed. 2d 304, 115 S. Ct. 1421 (1995) (Stevens, J., mem. op. on denial of *cert.*); *Elledge v. Florida*, 525 U.S. 944, 142 L. Ed. 2d 303, 119 S. Ct. 366 (1998) (Breyer, J., dissenting). Even by contemporary norms, the delay is exceptional. According to the most recent bulletin published by the United States Department of Justice's Bureau of Justice Statistics, the average elapsed time from sentence to execution for defendants of all races between 1977 and 1998 was 113 months. U.S. Department of Justice, Bureau of Justice Statistics Bulletin, *Capital Punishment 1998*, at 12 (December 1999). With a death row tenure of approximately 175 months, the defendant in this case has been facing the executioner for nearly 50% longer.

The courts of the British Commonwealth have ruled that imposition of capital punishment would be cruel and unusual punishment where the defendants have sat on death row for only a fraction of the time that this defendant has. Similarly, the European Court of Human Rights has held that holding an inmate on death row for six to eight years would contravene article 3 of the European Convention on Human Rights, which provides that "[n]o one shall be subjected to torture or to inhuman or degrading treatment or punishment." *Chambers v. Bowesox*, 157 F.3d 560, 570 (8th Cir. 1998).

I am unpersuaded by the suggestion that United States courts must tolerate greater delays than the courts of Europe because the American judicial system is more concerned with addressing meritorious claims and achieving correct results. In Illinois at least, the system for handling capital offenses has become notoriously unreliable. After matters degenerated to the point where our court no longer felt any compunction about illegally dismissing a death row inmate's appeal and having him summarily put to death (*People v. Kokoraleis*, M.R. 15833, Official Reports Advance Sheet No. 11, at 4-7 (June 2, 1999)), the Governor was forced to invoke his constitutional authority to grant reprieves (Ill. Const. 1970, art. V, § 12) and declared an indefinite moratorium on future executions. The moratorium remains in effect today.

I am likewise unpersuaded by the argument that capital defendants must suffer inordinate delays because it is they who initiate the legal proceedings which postpone their executions. Such an argument may carry some force where a defendant's claims are frivolous and initiated solely for purposes of delay, but few, if any, of the capital cases coming before us are subject to that criticism. In nearly every instance where an execution remains to be carried out after a decade or more, the additional litigation has been necessary to address errors occasioned by the prosecution or attributable to incompetent representation. It has not been the fault of the defendant.

So long as double jeopardy principles are not violated, the State must normally be given the opportunity to correct its mistakes and retry a defendant whose trial was found to be flawed. There must be a point, however, at which the court steps in and says enough is enough. Beyond a certain number of years and a certain number of failed attempts by the State to secure a constitutionally

valid sentence of death, the litigation becomes a form of torture in and of itself. It is as if the State were holding a defective pistol to the defendant's head day and night for years on end and the weapon kept misfiring. It may eventually go off, but then again, it may not, and the defendant has no way to be sure.

As the United States Supreme Court recognized more than a century ago, the suffering inherent in a prolonged and uncertain wait for execution is undeniable. See *In re Medley*, 134 U.S. 160, 172, 33 L. Ed. 835, 840, 10 S. Ct. 384, 388 (1890) ("when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it"). It is a dehumanizing experience known to precipitate mental illness and even suicide. See *Knight v. Florida*, 528 U.S. 990, 994, 145 L. Ed. 2d 370, 373, 120 S. Ct. 459, 462 (1999) (Breyer, J., dissenting); *Lackey*, 514 U.S. at 1045-46, 131 L. Ed. 2d at 305, 115 S. Ct. at 1421-22 (Stevens, J., mem. op. on denial of *cert.*). While some may find this just and fitting, I consider it to be inconsistent with "the evolving standards of decency" which inform eighth amendment jurisprudence. See *Trop v. Dulles*, 356 U.S. 86, 101, 2 L. Ed. 2d 630, 642, 78 S. Ct. 590, 598 (1958).

In my view, any delay of the magnitude present here caused by trial error for which defendant is not responsible raises compelling eighth amendment concerns. What makes this case particularly abhorrent, and what sets it apart from *Chambers v. Bowesox*, 157 F.3d 560 (8th Cir. 1998), cited by the majority, is the possibility of deliberate wrongdoing by the government. If defendant's charges are true, as we presume them to be for purposes of the present proceeding, the State responded to its previous failures to secure a valid death sentence by knowingly employing perjured testimony. By so doing,

the prosecution and the prosecution alone condemned defendant to untold additional time on death row. At a minimum, additional time will be needed to conduct the hearing ordered by our court today. If defendant's allegations prove meritorious, the entire sentencing process will have to begin again. Defendant's case will then be no closer to resolution that it was when he was first sentenced in 1985.

No reasonable claim can be made that such a delay is an inherent and inevitable byproduct of our capital justice system. Nothing in our system of capital punishment requires the knowing use of perjured testimony by the State. That decision was the responsibility of the State and the State alone. Its unilateral act of wrongdoing cannot be allowed to serve as the predicate for exacerbating defendant's death watch.

With each attempt by the State to secure defendant's death, the integrity of the process degrades. The passage of time brings an ever-greater likelihood that witnesses will disappear, memories will fade, and evidence will be lost. Retribution and deterrence, the two principal social purposes of capital punishment, carry less and less force. See *Lackey*, 514 U.S. at 1045-46, 131 L. Ed. 2d at 304-05, 115 S. Ct. at 1421-22 (Stevens, J., mem. op. on denial of *cert.*). Eventually, "an execution may well cease to serve the legitimate penological purposes that otherwise provide a necessary justification for the death penalty." *Elledge*, 525 U.S. at 945, 142 L. Ed. 2d at 303, 119 S. Ct. at 367 (Breyer, J., dissenting). By the time these proceedings are concluded, that point will have been reached here.

I continue to adhere to the view set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), that the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII,

XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). The result in every death case in Illinois is suspect, and no sentence of death should be allowed to stand. *People v. Davis*, 185 Ill. 2d 317, 353 (1998) (Harrison, J., concurring in part and dissenting in part). Even if the law were not otherwise invalid, however, I would nevertheless hold, for the reasons set forth above, that enforcement of the death penalty under the facts of this case would violate the eighth amendment's proscription against cruel and unusual punishment. Defendant's sentence of death should therefore be vacated, and the matter should be remanded for imposition of a term of imprisonment. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(j).

Even if the death penalty were constitutional and could be applied here without violating the eighth amendment, I still could not concur in this court's judgment. Although my colleagues are correct in concluding that the circuit court committed reversible error when it dismissed defendant's post-conviction claims of perjury without an evidentiary hearing, I believe that this case presents an even more fundamental problem. Under the constitution, it is "impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 239, 105 S. Ct. 2633, 2639 (1985). This is precisely what happened here.

A majority of the jurors in the case before us were misled regarding their responsibility for defendant's death sentence. As the majority points out, the trial judge told them during *voir dire* that their role was to "recommend" whether defendant should be sentenced to death. Any reasonable juror would understand this instruction to mean that the jury's decision to impose the death

sentence would not be binding and that ultimate responsibility for imposing capital punishment would rest with the trial judge. Such is not the case. Under section 9—1(g) of the Criminal Code of 1961, when a capital sentencing jury returns a sentence of death, the trial court is *required* to follow the decision of the jury and impose a death sentence. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g).

Because responsibility for imposing the death penalty rests solely with the jury, any implication that the responsibility is shared by, or delegated to, the trial court is improper. *People v. Johnson*, 146 Ill. 2d 109, 147 (1991). The majority's attempt to mollify the effects of the trial judge's remarks is unpersuasive. Rather than revealing statements taken out of context, the quoted colloquy between the trial judge and juror Slager corroborates defendant's claim.

Defendant's claim is further supported by the affidavit of the defense investigator, who stated under oath that juror Jekkel had told him that she believed that she was merely making a recommendation to the trial judge regarding imposition of the death penalty. Contrary to the majority's analysis, the investigator's statements do not constitute an improper attempt to impeach the jury's verdict. Rather, they provide direct corroboration that the harm addressed by *Caldwell v. Mississippi* was present in this case.

Defendant's attorneys were ineffective for failing to raise this claim. At a minimum, the matter should therefore be remanded to the trial court for a new sentencing hearing. Accordingly, I respectfully dissent.